H.E. BOECKING, JR. and SALLY BOECKING, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Boecking v. Commissioner
Docket Nos. 5897-90, 6269-90, 8489-90, 18404-90
United States Tax Court
T.C. Memo 1993-497; 1993 Tax Ct. Memo LEXIS 506; 66 T.C.M. (CCH) 1148; October 27, 1993, Filed *506 Decision will be entered under Rule 155. For petitioners: Reid E. Robison and Richard D. Craig. For respondent: Gary L. Bloom. JACOBS
JACOBS
MEMORANDUM OPINION JACOBS, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Boecking Machinery, Inc.
Docket No. 6269-90
Additions to Tax
Year Deficiency Sec. 6653(b)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1977
$   57,920
--
--
--
1979
739,605
68,769
--
--
1980
1,450,899
$ 1,243,263
--
--
1981
2,443,640
328,617
--
--
1982
42,666
--
$ 2,133
[1]
H.E. Boecking, Jr. and Sally Boecking
Docket Nos. 5897-90 and 18404-90
Additions to Tax Sec. Sec.
Sec.
Sec.
Year
Deficiency
Sec. 6653(a)
Sec. 6653(a)(1)
6653(a)(2)$
Sec. 6661
1980
$ 162,064
$ 8,103
--
--
--
1981
340,464
--
$ 17,023
[1]
--
1982
315,182
--
15,759
[1]
$ 78,796
1983
316,384
--
15,819
[1]
79,096
1984
312,849
--
15,642
[1]
78,212
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6661
1986
$ 1,225,896
$ 61,295
[1]
$ 293,373
*507 H.E. Boecking III and Sharon F. Boecking
Docket No. 8489-90
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6651(a)
6653(a)(1)
6653(a)(2)
6661
1984
$ 33,360
$ 7,365
$ 2,113
[1]
$ 8,340
1985
4,385
289
641
[1]
--
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded. H.E. Boecking, Jr. and Sally Boecking, husband and wife, are the parents of H.E. Boecking III who is married to Sharon F. Boecking. Sally and Sharon Boecking are parties by virtue of having filed joint returns with their husbands. The Boeckings (the individual petitioners) resided in Oklahoma City, Oklahoma, at the time they filed their respective petitions. Boecking Machinery, Inc. (the Company), an Oklahoma corporation, had its principal offices in Oklahoma City at the time it filed its petition. It was engaged in selling and servicing construction equipment manufactured by Caterpillar Tractor Company (as an authorized *508 dealership) in the central and western parts of Oklahoma. It commenced business operations in February 1962, and was liquidated on December 31, 1986. At all relevant times, H.E. Boecking, Jr. was directly or indirectly the sole shareholder of the Company, its president, and chairman of its board of directors. Power Leasing, Inc., an Oklahoma corporation, was organized on or about January 1, 1971, for the stated purpose of leasing transportation equipment, including airplanes and automobiles. Prior to January 10, 1985, H.E. Boecking, Jr. and J.D. Koberg (not related to the Boeckings) each owned 50 percent of its stock. From January 10, 1985 to October 31, 1986 (the date Power Leasing, Inc. was liquidated), H.E. Boecking, Jr. owned all the stock of Power Leasing, Inc. Power Leasing, Inc. leased to the Company a model 1121B Aero Commander airplane from May 2, 1979 through September 30, 1981 and a West Wind model 1124 airplane from November 7, 1981 through January 14, 1985. It did not lease equipment to persons or corporations other than the Company. After concessions, the issues for decision are: 1. Whether advances made by Boecking Machinery, Inc. to H.E. Boecking, Jr. during *509 the period 1980-1984 and an advance made by Power Leasing, Inc. to him in 1984 were loans (as contended by petitioners) or constructive dividends (as contended by respondent); 2. whether Boecking Machinery, Inc.'s payment of premiums for insurance on the life of H.E. Boecking, Jr. and payment of airplane leasing costs constituted constructive dividends; 3. whether respondent properly disallowed a portion of the deductions claimed by Boecking Machinery, Inc. for airplane leasing payments to Power Leasing, Inc.; 4. whether H.E. Boecking III's acquisition of shares of stock in Commercial Bank was for the benefit of Boecking Machinery, Inc., so that Boecking Machinery, Inc.'s repayment of a loan taken out by H.E. Boecking III to finance said acquisition would not constitute a constructive dividend; 5. the dollar value of various assets distributed to H.E. Boecking, Jr. upon the liquidation of Boecking Machinery, Inc., and, whether the value of such assets should be reduced to reflect a $ 9,809,381 proposed corporate income tax deficiency for which H.E. Boecking, Jr. would be liable as a transferee; 6. whether respondent properly terminated Boecking Machinery, Inc.'s election *510 to use the LIFO method of inventory valuation; 7. whether Boecking Machinery, Inc. is liable for the addition to tax for civil fraud; 8. whether both the corporate and individual petitioners are liable for the addition to tax for negligence; 9. whether the individual petitioners are liable for the addition to tax for substantial understatement of income tax; and 10. whether H.E. Boecking III and Sally F. Boecking are liable for the addition to tax for late filing. Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated by this reference. For ease of analysis, our findings of fact and opinion for each issue are combined, and each issue is discussed under a separate heading. Issues 1 and 2. Constructive Dividends -- H.E. Boecking, Jr.
Respondent determined that H.E. Boecking, Jr., (sometimes referred to as Mr. Boecking) received benefits from both the Company and Power Leasing, Inc. which constituted constructive dividends. These benefits were: Personal use of corporate assets, payment of Mr. Boecking's personal expenses, distributions to Mr. Boecking classified as "loans", and discriminatory life *511 insurance policies. The parties have resolved their differences with regard to the taxation of some of these benefits. Those benefits, the taxation of which remains in dispute, are: Item
1980
1981
1982
1983
1984
Interest
--
[1] $   3,458
--
--
--
Life insurance
$   8,790
30,645
$  27,805
$  65,802
$ 62,764
Shareholder loans
146,220
341,865
364,172
345,152
--
$ 155,010
$ 375,968
$ 391,977
$ 410,954
$ 62,764
A. Life Insurance Policies
The Company paid and deducted life insurance premiums as follows: Year
Amount
1979
$ 29,580
1980
29,580
1981
62,887
1982
61,276
1983
49,928
1984
48,696
The policies insured the lives of the officers and employees of the Company. *512 The Company has conceded that the following amounts claimed as life insurance expenses are not allowable deductions: Year
Amount
1979
$ 29,580
1980
29,580
1981
23,695
1984
48,696
On September 1, 1976, the Company amended its group-term life insurance plan in order to increase the life insurance coverage on its president from $ 40,000 to $ 1,040,000. The $ 1,000,000 increase in coverage was accomplished by the Company's purchase of policy number 1660689 from Connecticut General Life Insurance Company. The policy provided permanent benefits to Mr. Boecking. It was surrendered to Connecticut General, effective September 1, 1981, in exchange for its $ 78,000 cash surrender value. Connecticut General paid the $ 78,000 to Mr. Boecking on December 21, 1981. Thereafter, on December 23, 1981, Mr. Boecking paid the $ 78,000 to the Company. The Company credited the $ 78,000 to Mr. Boecking's shareholder loan account. On May 1, 1981, the Company adopted a Retired Lives Reserve group plan which provided life insurance coverage to its officers and employees in the following amounts: Amount of
Class
Description
Coverage
I
President
$ 4,000,000
II
Accountant and used
equipment manager
250,000
III
Controller and managers
100,000
IV
All other employees
10,000
*513 Class I included only the Company's president (Henry E. Boecking, Jr.) and Class II included only Henry E. Boecking, Jr.'s sons (Curt G. Boecking and Henry E. Boecking III). The beneficiary of the $ 4,000,000 policy insuring H.E. Boecking, Jr.'s life was the estate of the insured. Respondent determined that the $ 4,000,000 policy on the life of H.E. Boecking, Jr., grossly discriminated in favor of H.E. Boecking, Jr. (the Company's president and sole shareholder) and that the premiums thereon were not intended as additional compensation to Mr. Boecking. Accordingly, respondent determined that the premiums paid by the Company on the policy were not deductible by the Company and that the Company's payment of the premiums constituted a constructive dividend to H.E. Boecking, Jr. Respondent's determinations are presumptively correct, and petitioners bear the burden of proving otherwise by a preponderance of the evidence. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). Petitioners introduced no evidence that the premiums paid by the Company were intended to be additional compensation to H.E. Boecking, Jr. Nor did they introduce evidence *514 that respondent's determination in this regard was erroneous or even discuss this item in their briefs. Hence, we deem that petitioners have conceded this issue. Accordingly, respondent's determinations with regard to the Company's payment of premiums on the several policies insuring the life of H.E. Boecking, Jr. are sustained. As such, with respect to the Company, the premium payments are not deductible; and with respect to H.E. Boecking, Jr., the Company's payment of the premiums constitutes a constructive dividend. B. Shareholder Loans
As of the dates indicated, the Company's books reflected (as assets) the following balances due from H.E. Boecking, Jr.: [2]
Open Notes
Account
Total
12/31/78
$   168,894
$   337,465
$   506,359
12/31/79
168,894
373,574
542,468
12/31/80
400,000
270,114
670,114
12/31/81
400,000
579,934
979,934
12/31/82
400,000
910,800
1,310,800
12/31/83
400,000
1,228,448
1,628,448
12/31/84
1,463,582
40,000
1,503,582
12/31/85
1,463,582
238,042
1,701,624
12/31/86
1,463,582
269,084
1,732,666
*515 H.E. Boecking, Jr. executed four notes in favor of the Company, as follows: Date
Amount Explanation
5/23/75
$   168,894
No payments were made
during the period May 23,
1975 through December 31,
1980.
12/31/80
400,000
This note includes $ 231,106
transferred from the loan to
shareholder account to long-term
debt and $ 168,894 from the
5/23/75 note on which no
payments had been made.
The note carried a 10 percent
interest rate and was due on
December 31, 1982. Interest on
the note was accrued on the
Company's books for the years
1981, 1982, and 1984, but not
1983. No payments were made on
the note during the period
December 31, 1980 through
December 31, 1984.
12/31/84
400,000
This note was a renewal of the
$ 400,000 note executed on
12/31/80.
12/31/84
1,063,582
This note included the balance
in the loans to shareholder
account as of 12/31/84.
The total outstanding balance of shareholder advances to H.E. Boecking, Jr. in the amount of $ 1,732,666 as of December 31, 1986, was purportedly canceled by a liquidating distribution to Mr. Boecking in 1986. *516 Reductions in the shareholder advance account were made from time to time when the Company deducted sums that it otherwise would have paid to H.E. Boecking, Jr. On three occasions, December 31, 1979, December 31, 1980, and December 31, 1981, net bonus payments otherwise payable to H.E. Boecking, Jr. were credited to the outstanding loans to shareholder accounts. The shareholder advance account was reduced by $ 78,000 on December 23, 1981. That reduction was funded by the cash surrender proceeds from Connecticut General Life insurance policy number 1660689. The shareholder advance account was reduced by $ 400,000 on December 31, 1984. That reduction was funded by proceeds received from Power Leasing, Inc. The $ 400,000 payment was treated by Power Leasing, Inc. as a loan to shareholder H.E. Boecking, Jr. No collateral was pledged by H.E. Boecking, Jr. nor was any note given with respect to the $ 400,000 payment from Power Leasing, Inc. H.E. Boecking, Jr. made no repayments on the $ 400,000 advance nor was any interest charged. Respondent determined that the amounts indicated on the Company's records as balances due from H.E. Boecking, Jr. constituted constructive dividends *517 to him, rather than loans. Respondent also determined that the $ 400,000 payment from Power Leasing, Inc. to the Company constituted a constructive dividend to H.E. Boecking, Jr. rather than a loan. Petitioners contend that at all times H.E. Boecking, Jr. intended to repay the advances made to him by the Company and Power Leasing, Inc. and that he had the financial resources (by selling certain real estate owned by him) to do so. With respect to the $ 400,000 advance by Power Leasing, Inc., petitioners point out that at the time of that advance, H.E. Boecking, Jr. owned just 50 percent of Power Leasing, Inc. and that the other owner was an unrelated party. Sections 301[3] *518 and 316[4] provide that a distribution of property made by a corporation with respect to its stock is a taxable dividend to the extent of the corporation's earnings and profits. "A constructive dividend is paid when a corporation confers an economic benefit on a stockholder without the expectation of repayment." Wortham Machinery Co. v. United States, 521 F.2d 160, 164 (10th Cir. 1975) (citations omitted). Where, as here, there is a dispute in the evidence, the determination of whether stockholder withdrawals are bona fide loans or constructive dividends is a question of fact, the resolution of which must be based on all the surrounding circumstances. Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. T.C. Memo. 1978-306; see also Alterman Foods Inc. v. United States, 505 F.2d 873, 875-876 (5th Cir. 1974); Berthold v. Commissioner; 404 F.2d 119, 121 (6th Cir. 1968), affg. T.C. Memo. 1967-102; Chism's Estate v. Commissioner, 322 F.2d 956, 959-960 (9th Cir. 1963), *519 affg. T.C. Memo. 1962-6; Kaplan v. Commissioner, 43 T.C. 580, 595 (1965); Roschuni v. Commissioner, 29 T.C. 1193, 1201-1202 (1958), affd. per curiam 271 F.2d 267 (5th Cir. 1959). Courts have considered various factors when deciding whether withdrawals are constructive dividends or loans; however, no factor, standing alone, is determinative. The factors include the following: (1) The extent to which the shareholder controlled the corporation; (2) whether the corporation had a history of paying dividends; (3) the existence of earnings and profits; (4) the magnitude of the advances and whether a ceiling existed to limit the amount the corporation advanced; (5) how the parties recorded the advances on their books and records; (6) whether the parties executed notes; (7) whether security was provided for the advances; (8) whether there was a fixed schedule of repayment; (9) whether interest was paid or accrued; (10) whether the shareholder made any repayments; (11) whether the shareholder was in a position to repay the advances; and (12) whether the advances *520 to the shareholder were made in proportion to his stock holdings. Alterman Foods, Inc. v. Commissioner, supra at 877 n.7; Pierce v. Commissioner61 T.C. 424, 430 (1974). Although courts have traditionally considered these factors in determining the existence of a loan, the dispositive question is whether, at the time of the withdrawals, the shareholder intended to repay the amounts received and the corporation intended to require payment. Miele v. Commissioner, 56 T.C. 556, 567-568 (1971), affd. without published opinion 474 F.2d 1338 (3d Cir. 1973). If repayment was intended at the time of the withdrawals, the amounts are generally considered to be loans; conversely, if no repayment was intended at the time of the withdrawals, the amounts are considered to be dividends. After applying the aforementioned factors to the distributions to H.E. Boecking, Jr., we hold that H.E. Boecking, Jr.'s channeling of funds from the Company's fisc to himself should be classified for tax purposes as dividends rather than loans. Likewise, we hold that the $ 400,000 distribution from Power Leasing, *521 Inc. to Mr. Boecking was a constructive dividend. Our holdings are based on two findings: First, we find H.E. Boecking, Jr. did not intend to repay the advances at the time of each such transaction; and second, based upon all the facts and circumstances surrounding the transactions, we find the advances appear to be more like constructive dividends than bona fide loans. H.E. Boecking, Jr. testified that he intended to repay the $ 400,000 advance from Power Leasing, Inc. But, a mere declaration by a shareholder that he intended a withdrawal to constitute a loan is insufficient if the transaction fails to meet more reliable indicia of debt. Williams v. Commissioner, supra; see also Alterman Foods Inc. v. United States, supra at 875-876. Such a self-serving declaration must be weighed against the surrounding circumstances. Williams v. Commissioner, supra.
In Dolese v. United States, 605 F.2d 1146, 1154 (10th Cir. 1979), the Court of Appeals for the Tenth Circuit, the circuit to which this case is appealable, stated: Perhaps in recognition of *522 human nature, the courts have been liberal in cases of shareholder borrowing from controlled corporations. They have tolerated channeling particular types of personal transactions through the corporations. They have even approved payment of personal living expenses, but in significantly smaller sums and under different circumstances. But whereas withdrawal of reasonable amounts are countenanced as a loan if other loan factors are present, excessive and continuous diversion of corporate funds into the controlling shareholder's pocket takes on a different character. There is a principle of too much; phrased colloquially, when a pig becomes a hog it is slaughtered. [Citations omitted.]
Here, H.E. Boecking, Jr.'s continuous and excessive channeling of corporate funds for his own use crossed the bounds of reasonableness into the arena of flagrant abuse. The totality of the objective facts in this case, rather than H.E. Boecking, Jr.'s testimony as to his subjective intent, clearly supports respondent's determination that H.E. Boecking, Jr.'s withdrawals of corporate funds were not bona fide loans. At all relevant times, H.E. Boecking, Jr. was either directly or indirectly the *523 Company's sole shareholder. And it has long been settled that transactions between a closely held corporation and its shareholder require close scrutiny. Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1339 (1971), affd. without published opinion and affd. without published opinion sub nom. Jiminez v. Commissioner, 496 F.2d 876 (5th Cir. 1974). While Mr. Boecking did not own a majority of Power Leasing, Inc. at the time of the $ 400,000 advance to him (he owned 50 per cent of its stock), he effectively had control of Power Leasing, Inc. as evidenced by: (1) Power Leasing, Inc's primary function was to provide leased property to the Company, and it had few, if any, clients other than the Company; (2) Power Leasing, Inc.'s other 50 per cent owner was an employee of the Company; and (3) Mr. Boecking became Power Leasing, Inc.'s sole shareholder shortly after the $ 400,000 advance was distributed to him. As to the withdrawals from the Company, we note that from January 1, 1980 until December 31, 1984, the amount of H.E. Boecking, Jr.'s shareholder advances (and notes) increased continually (except for one year) almost *524 threefold; they rose from $ 542,468 to $ 1,503,582. While the Company had substantial earnings and profits during the years in issue, [5] it never declared or paid a dividend. The Company placed no ceiling or restrictions on the amount of his borrowings. The Company required no security or collateral for the advances, and Mr. Boecking offered none. No interest was charged on Mr. Boecking's open account. And there was no fixed schedule of repayment. As to the $ 400,000 advance from Power Leasing, Inc., H.E. Boecking, Jr. did not pledge any collateral therefor nor was any note given with respect to the $ 400,000 payment. H.E. Boecking, Jr. made no repayments on the $ 400,000 advance nor was any interest charged. In addition, there was no fixed schedule *525 of repayment. While Power Leasing, Inc. apparently had earnings and profits during all the years in issue, it never declared or paid any dividends. And Power Leasing, Inc. placed no ceiling or restrictions on the amount of Mr. Boecking's borrowings. In support of their claim that the $ 400,000 advance from Power Leasing, Inc. was a bona fide loan, petitioners note that the advance was not in proportion to Mr. Boecking's ownership. We are unpersuaded by this argument, since it has long been settled that a distribution of corporate earnings and profits to a shareholder may constitute a constructive dividend notwithstanding that it is not in proportion to stock holdings or that some shareholders do not participate in its benefits. Roschuni v. Commissioner, 29 T.C. at 1204. In support of their claim that the advances from the Company were loans, petitioners point to a number of factors that they believe indicate that the advances were bona fide loans. First, petitioners emphasize that the Company recorded on its books the advances as loans, and, in some instances, notes were given by Mr. Boecking to evidence said advances. The facts that some notes *526 existed and that the Company recorded the advances as loans, however, are not determinative. As president and controlling shareholder, Mr. Boecking had the authority to direct the Company's business affairs. Mr. Boecking could have ordered that the withdrawals be recorded as loans by the Company even if he did not intend to repay them. We believe that is exactly what happened here. Prior to 1984, Mr. Boecking did execute notes, but they reflected only a portion of his total borrowings from the Company. [6] Further, it was not until 1984, when the imputed interest rules mandated by section 7872 became effective, that Mr. Boecking executed a note for the yearend balance in his shareholder advance account. *527 Second, petitioners point to Mr. Boecking's repayments as evidence of a loan. While a shareholder's repayments are usually strong evidence that the withdrawals were a loan, the repayments themselves must be bona fide. Crowley v. Commissioner, T.C. Memo. 1990-636, affd. without published opinion 962 F.2d 1077 (1st Cir. 1992). Mr. Boecking apparently made a number of cash repayments to the Company, but the total amount repaid was only a small fraction of his outstanding balance. Mr. Boecking withdrew large sums from the Company with impunity. Due to successive borrowings, he was able to use a portion of each borrowing to repay his prior outstanding loan balance. In so doing, he was able to divert the Company's funds for his personal use, give such withdrawals the color of loans, and never repay a penny out of his own pocket. With regard to the yearend bonuses which the Company credited against his account, we are mindful that Mr. Boecking had the authority to determine the size of his salary and yearend bonus. As such, the Company's declaration of yearend bonuses and Mr. Boecking's subsequent use of those bonuses to *528 credit his loan account were simply bookkeeping entries designed to give his large withdrawals the color of loans. Under these facts, we believe the alleged "repayments" do not establish the existence of bona fide loans. Third, petitioners emphasize Mr. Boecking's financial ability to repay the advances as further proof that he intended to repay the purported loans. As evidence of Mr. Boecking's ability to repay the advances, petitioners offered evidence of Mr. Boecking's real property holdings. While Mr. Boecking may have held parcels of real property that were worth a significant sum during the years in issue, other than an alleged oral agreement to repay the advances (which was communicated to a now-deceased former employee of the Company), there is no evidence that he had committed himself, by way of mortgage or otherwise, to apply his share of real property sales proceeds toward the payment of his loan account. In summary, petitioners failed to carry their burden of proving that the advances to H.E. Boecking, Jr. from the Company and Power Leasing, Inc. were loans. Accordingly, we sustain respondent's determination that the advances constitute constructive dividends to him. *529 Issue 3. Airplane Leasing Expenses -- Boecking Machinery, Inc.
Respondent determined that airplane leasing payments from the Company to Power Leasing, Inc. for 1979 through 1983, respectively, were excessive, and hence were not ordinary and necessary business expenses. As a result, respondent adjusted Boecking Machinery, Inc.'s taxable income for 1979 through 1984 as follows: Increase
Taxable
Leasing Expenses
Leasing Expenses
(Decrease)
Year
Claimed
Determined
Taxable Income
1979
$ 187,200
$  90,000
$  97,200 1980
187,200
90,000
97,200 1981
391,090
217,500
173,590 1982
814,252
600,000
214,252 1983
814,252
600,000
214,252 1984
563,004
600,000
(36,996)
After concessions by the parties, the airplane leasing costs in issue are as follows: Taxable Year
Increase (Decrease) Taxable Income
1979
$  66,971 1980
60,361 1981
103,633 1982
124,480 1983
32,195 1984
(36,996)
Petitioners failed to introduce evidence sufficient to disprove respondent's determinations. Further, petitioners failed to mention the issue in their briefs. Hence, we deem that they have conceded this issue. Accordingly, subject to the parties' concessions, *530 respondent's adjustments on this issue are sustained. Issue 4. Constructive Dividends -- H.E. Boecking III
Respondent determined that the Company's payment of a debt ($ 94,864) incurred by H.E. Boecking III upon the purchase of 9,511 shares in the initial offering of stock of Commercial Bank (of Oklahoma City), held in his name, was a constructive dividend. [7] Petitioners contend that H.E. Boecking III borrowed the money to purchase the stock, and subsequently held the stock, solely for the benefit of the Company. At first blush, H.E. Boecking III's personal involvement in the purchase of the bank stock would seem to support respondent's determination that H.E. Boecking III did in fact receive a constructive dividend. After all, H.E. Boecking III took out a personal loan in an amount greater than $ 95,000, used the proceeds to purchase shares in Commercial Bank, pledged the Commercial Bank shares back to the lender as security *531 for the $ 95,000 note, and was then discharged from personal liability on that note when the Company subsequently satisfied the debt. Absent any valid corporate purpose supporting this unusual transaction, we would sustain respondent's proposed adjustment. But H.E. Boecking III and the Company had a valid corporate purpose to support the suspicious structure of the transaction. In uncontroverted testimony, which we find credible, H.E. Boecking III established that he purchased the Commercial Bank shares in his own name so that he could serve as a director of Commercial Bank. He was instructed to do so by his father in order to further the Company's business relationship with Commercial Bank. And the Company determined that such a relationship would be beneficial to the Company for two reasons: First, to facilitate lending to customers of the Company's goods and services; and second, to enable certain low-wage employees of the Company to cash payroll checks and open small individual accounts at Commercial Bank. Petitioners established that there was an understanding between H.E. Boecking III and the Company regarding the risks and rewards related to the ownership of the Commercial *532 Bank stock; it was understood that any gains or losses related to the ownership of those shares would be borne solely by the Company. Thus, we find that H.E. Boecking III held the Commercial Bank stock solely for the benefit of the Company. Accordingly, respondent's adjustment as to this issue is not sustained. Issue 5. Value of Liquidation Distributions to H.E. Boecking, Jr.
In December 1986, the Company distributed its assets to H.E. Boecking, Jr. pursuant to a plan of complete liquidation. The market values of the following corporate assets distributed to H.E. Boecking, Jr. are not in dispute: Fair Market Value
Asset
as of December 31, 1986
Cash
$ 1,679,473
Inventory
9,500
Other investments
8,247
Depreciable assets
10,102
Other assets
12,983
Life insurance
39,115
The market values of the following corporate assets distributed to H.E. Boecking, Jr. are in dispute: Book Value
Asset
as of December 31, 1986
Accounts receivable
$ 1,469,703
Loans to shareholders
1,732,666
Land
300,200
In addition to the aforementioned valuation disputes, the parties disagree as to whether the gross value of the assets distributed to H.E. Boecking, Jr. should *533 be reduced by all or a portion of a $ 9,809,381 proposed corporate income tax liability for which H.E. Boecking, Jr. would be liable as a transferee. A. Accounts Receivable
Petitioners contend that the distributed corporate accounts receivable were: worth no more than $ 720,000 (the net amount collected, deducting fees and expenses attributable to collection). These [sic] amounts should be further discounted to determine their value as of the date of liquidation of the Company, as they were noninterest bearing receivables.
Not surprisingly, respondent contends that the accounts receivable should be valued at book value. We agree with respondent. Curt Boecking, an employee and officer of the Company at various times during the years in issue, testified that the book value of the accounts receivable was overstated and that the Company collected only $ 860,000 of its outstanding accounts receivable through December 31, 1989. The fact that the Company eventually collected only $ 860,000 of its accounts receivable is not determinative of the value of the accounts receivable on the date of liquidation. Petitioners offered no independent evidence to establish that *534 the book value of the accounts receivable was greater than the fair market value of the receivables on the date of liquidation. Further, the record is devoid of any evidence regarding collection efforts or the obligors' financial condition. Accordingly, we sustain respondent's adjustment and hold that the net value of the accounts receivable at the time of the Company's liquidation was $ 1,469,703 (book value as of the date of liquidation). B. Loans to Shareholders
The parties agree that classification of the Company's advances to H.E. Boecking, Jr. (loans or dividends) is dispositive in determining the value of loans to shareholders account. Since we hold that all of the Company's advances to H.E. Boecking, Jr. are to be classified as dividends, the loans to shareholders account had no value as of the date of liquidation. C. Land
Respondent determined the value of the land distributed to H.E. Boecking, Jr. on the liquidation date (i.e., December 1986) was $ 998,000; petitioners contend the value of the land on such date was not more than the amount paid when they acquired it in 1981 (approximately $ 300,000). Respondent's determination that the distributed land was *535 worth $ 998,000 is based upon a valuation report prepared by Paul Meade, a valuation engineer employed by the Internal Revenue Service. Mr. Meade arrived at the $ 998,000 valuation by reference to sales of property which he and another valuation engineer deemed comparable. He discounted the price-per-square-foot of the comparable properties to account for the general decline in the Oklahoma economy during the period just prior to the liquidation; and he further reduced the value of the land because, while it is visible from a major highway, it has poor access to that highway. Petitioners did not introduce independent evidence contradicting respondent's valuation report. We therefore find that the market value of land distributed to H.E. Boecking, Jr. as of the date of the liquidation, was $ 998,000. D. Reduction for the Proposed Corporate Income Tax Deficiency
Dollarwise, the most significant question to be resolved in determining the amount distributed to H.E. Boecking, Jr. in complete liquidation of the Company is whether the gross amount distributed should be reduced by all or any portion of a proposed corporate income tax deficiency and penalties for which Mr. Boecking *536 would be liable as a transferee. The IRS asserted corporate income tax deficiencies in a 30-day letter, dated November 25, 1986. The deficiencies are for years 1977 and 1979 through 1984. The 30-day letter was preceded by an extensive 18-month audit. Petitioners assert that no gain should be recognized on the distribution of the assets in liquidation of the Company because "Even using Respondent's valuation of Company assets distributed, the tax liability asserted by Respondent exceeded the value of Company assets by almost two to one ($ 10,000,000 tax liability to $ 5,000,000 asset value)". Respondent argues that petitioner should not be able to reduce the value of the assets received in liquidation by the amount of the proposed tax adjustment. Section 331(a)[8] provides that amounts distributed in complete liquidation of a corporation are treated as full payment in exchange for the shareholder's stock. Section 1.331-1(b), Income Tax Regs., [9] provides that the gain or loss to a shareholder from a distribution in complete liquidation is to be determined under section 1001[10] to the extent the amount of the distribution exceeds the shareholder's cost or other basis in the *537 stock. Section 1001(b) provides that the amount realized from the sale of property is the sum of any money received plus the fair market value of any property received. Where distributions in complete liquidation of a corporation are subject to liabilities, only the net amount received by the respective shareholders is taxable. Ford v. United States, 160 Ct. Cl. 417, 424, 311 F.2d 951, 954 (1963); Petersen v. Commissioner, T.C. Memo. 1971-21. *538 Notwithstanding the numerous arguments advanced by each party, resolution of the question of whether the amount of the liquidation distribution to Mr. Boecking should be reduced by the amount of the proposed tax liability depends upon whether prior to the date of complete liquidation, the Company's liability for the asserted deficiencies was fixed (i.e., uncontested) or contingent (i.e., contested). In resolving this question, we turn for guidance to those cases involving the timing of a deduction for a tax liability. In Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, 519 (1944), the Supreme Court held that a taxpayer could not deduct the amount of assessed tax until the taxpayer's liability for the tax was finally adjudicated. In so holding, the Court stated: It has long been held that, in order to truly reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer. [Fn. refs. omitted.]
Id. This holding was *539 reiterated by the Supreme Court in Security Flour Mills v. Commissioner, where the Court stated: It is settled by many decisions that a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent, and this principle is fully applicable to a tax, liability for which the taxpayer denies and payment whereof he is contesting. * * *
321 U.S. 281, 284 (1944) [fn. ref. omitted]. Since the decisions of the Supreme Court in Dixie Pine Products Co. and Security Flour Mills Co., a number of courts have considered whether a taxpayer may accrue a deduction for a contested liability. See, e.g., United States v. Consolidated Edison Co., 366 U.S. 380 (1961); Lutz v. Commissioner, 396 F.2d 412 (9th Cir. 1968) revg. 45 T.C. 615 (1966); Hollingsworth v. United States, 215 Ct. Cl. 328, 568 F.2d 192 (1977); Dravo Corp. v. United States, 172 Ct. Cl. 200, 348 F.2d 542 (1965); Agency of Canadian Car and Foundry Co. v. Commissioner, 39 T.C. 15 (1962); *540 General Communication Co. v. Commissioner, 33 T.C. 640 (1960); Great Island Holding Corp. v. Commissioner, 5 T.C. 150 (1945). Examination of the case law developed after the Supreme Court visited this issue in 1944 reveals that many courts have struggled to interpret exactly what the Supreme Court meant when it used the term "contest" in this context. Ultimately, the determination of whether a particular taxpayer was contesting a tax liability depends upon the facts and circumstances of each case. In the instant case, prior to and following the date of liquidation of the Company, the Company was contesting the existence of its liability for the taxes asserted in the 30-day letter, dated November 25, 1986. As a result, the events fixing the fact and amount of the Company's tax liability did not occur prior to the date of its complete liquidation. Consequently, the Company could not properly accrue the proposed tax liability prior to the date of its liquidation, and petitioners cannot offset the tax liability against the gross assets received by Mr. Boecking in connection with the liquidation of the Company. We have *541 held that the "contingent and contested" tax rule as stated in Dixie Pine Products Co. and Security Flour Mills Co. is not limited to cases where the tax liability is the subject of actual litigation. Great Island Holding Corp. v. Commissioner, 5 T.C. 150, 159 (1945). In Great Island Holding Corp., the facts indicated that the taxpayer "consistently denied liability" for the proposed taxes even before formal assessment of the taxes. Id. In another case, General Communication Co. v. Commissioner, 33 T.C. 640 (1960), we held that the taxpayer had not carried its burden of proving that certain royalty liabilities were in fact uncontested because the taxpayer neither admitted liability nor entered into negotiations for a settlement thereof. Id. at 654. Addressing the argument that a "judicial contest or express repudiation" of the liability was required for a contest to exist, we stated: The taxpayer has the burden of proving that the asserted liability was in fact uncontested. The presence of an admission, express or implied, serves as direct proof that the taxpayer *542 was not contesting liability. But absence of an admission, while not conclusive proof of a contest, certainly leaves a gap in petitioner's proof in the circumstances of this case. A taxpayer may resist payment of an asserted claim in more subtle ways than express denial of liability or adoption of a litigious attitude. * * *
Id. [fn. ref. omitted.] Petitioners rely on Dravo Corp. v. United States, 172 Ct. Cl. 200, 204-207, 348 F.2d 542, 544-546 (1965) and Woodmont Terrace, Inc. v. United States, 261 F. Supp. 789, 792 (M.D. Tenn. 1966) to support their claim that the proposed taxes were uncontested. Petitioners reliance on Dravo and Woodmont is misplaced. In Dravo, the Court of Claims rejected the Government's argument that the mere filing of a tax return acknowledging a liability in a stated amount is an implied "contest" regarding any greater amounts asserted by respondent. Dravo Corp. v. United States, supra. In Woodmont Terrace, the District Court embraced the holding in Dravo and stated: Therefore, in the absence *543 of any type of formal proceedings or a more obvious lack of acquiescence on the part of the plaintiff, this court is of the opinion that the meeting of February 2 did not constitute the type of "contest" contemplated by Dixie Pine Products. * * *
Woodmont Terrace, Inc. v. Commissioner, 261 F. Supp. at 793. Contrary to supporting petitioner's position, Dravo and Woodmont Terrace actually support respondent's proposed adjustment. As shown below, here, the record indicates that there was an "obvious lack of acquiescence" on the part of the Company regarding the proposed taxes. Petitioners have not met their burden of proving that the proposed tax liability was in fact uncontested prior to the complete liquidation. The Company did not expressly or impliedly admit liability for the taxes proposed in the 30-day letter at any time before the complete liquidation. In fact, the Company continually denied liability as early as March 4, 1986, and through at least March 15, 1987, months after the complete liquidation. On March 4, 1986, the Company's certified public accountants prepared the Company's financial statements for the year ended *544 December 31, 1985. In the notes to said financial statements, under the heading "CONTINGENT LIABILITIES", the Company acknowledged receipt of the revenue agent's report relating to the proposed tax liability for taxable years 1979 through 1984. After outlining the total taxes and penalties proposed by respondent, the note stated: This includes disallowance of LIFO method of accounting for inventories, which the company believes is without basis. Without the LIFO factor, the maximum tax liability proposed is approximately $ 2,027,465, plus interest and penalties. The company believes a substantial portion of these proposed changes to be without merit also. The company intends to vigorously defend against these assessments and penalties, however, $ 472,000 has been provided in the balance sheet as a current liability for income taxes. [Emphasis supplied.]
On March 15, 1987, which was after the Company's liquidation, the Company's certified public accountants prepared the Company's financial statements for the year ended December 31, 1986. In the notes to said financial statements, under the heading "CONTINGENT LIABILITIES", there was a statement: This includes *545 disallowance of LIFO method of accounting for inventories, which the company believes is without basis. Without the LIFO factor, the maximum tax liability proposed is approximately $ 2,027,465, plus interest and penalties. The company believes a substantial portion of these proposed changes to be without merit also. The company intends to vigorously defend against these assessments and penalties, however, $ 672,000 has been provided in the balance sheet as a current liability for income taxes in addition to amounts owed on the 1986 income tax return. [Emphasis supplied.]
Although the Company made provisions on its balance sheets in the amounts of $ 472,000 and $ 672,000 for years ended 1985 and 1986, respectively, it did not admit liability therefor. Prior to its liquidation, the Company did not execute the necessary forms allowing respondent to assess and collect proposed taxes in any amount. The Company's failure to admit liability for the proposed taxes, coupled with its intention to "vigorously defend" against taxes (which it characterized as "without basis"), compels us to find that the proposed tax liabilities were being contested by the Company on the *546 date of complete liquidation. And the Company's filing of a written document with respondent with respect to the asserted tax liability in 1987 serves to buttress a finding that the proposed tax liabilities were being contested after the date of the Company's liquidation. See sec. 1.461-2(b)(2), Income Tax Regs.
Even though the record indicates that petitioners contested the entire proposed tax liability, petitioners and respondent stipulated that: A total of at least $ 694,690.00 in tax plus statutory interest liability, (excluding the impact of restricted interest) through the date of liquidation of the Company was never contested by the Company * * *
To give effect to the stipulation of the parties, we hold that $ 694,690 in tax, plus statutory interest through the date of complete liquidation, was not contested by the Company. Accordingly, respondent's adjustment on this issue, subject to the aforementioned stipulation, is sustained. [11]
*547 Issue 6. Revocation of LIFO Election
The Company filed a Form 970, Application to Use LIFO Inventory Method, in 1970 with the Internal Revenue Service Center at Austin, Texas. On that form, the Company elected to convert its method of valuing inventory from FIFO (first in, first out) to LIFO (last in, first out) reserves. The Company's LIFO inventory reserve as of the beginning of calendar year 1980 was $ 2,933,099. The additions and reductions to the Company's LIFO reserve during the years in issue were as follows: Year
Additions to LIFO Reserve
1980
$ 2,095,533 1981
857,464 1982
651,103 1983
222,217 1984
(2,249,590)
Pursuant to the Company's election, it utilized two dollar-value pools to calculate its LIFO reserves. Pool #1 consisted of new Caterpillar and Towmotor parts. Pool #2 consisted of new Caterpillar and Towmotor machines, engines, and equipment. Petitioners advance a number of arguments in support of their claim that respondent's termination of the Company's LIFO method of accounting is invalid. Petitioners first argue that the Company consistently used an acceptable adaptation of the LIFO method it elected in 1970, which method petitioners *548 assert clearly reflected the Company's income during the years in issue. Petitioners next argue that the Company's method of calculating the LIFO reserve was tacitly approved by respondent (because no adjustments thereto were made during earlier tax audits) and thus respondent is estopped from subsequently terminating the Company's LIFO election. Petitioners finally argue that respondent's termination of the Company's LIFO method as of January 1, 1980, the earliest open year on this issue, is arbitrary, unreasonable, and an abuse of discretion. Respondent contends that it has the authority to terminate the Company's LIFO election as early as January 1, 1980. In response to petitioners' arguments, respondent asserts that due to the Company's failure to maintain certain required books and records, the Company's method of valuing its LIFO reserves did not comport with the method elected by the Company in 1970, and, accordingly, the method utilized by the Company did not clearly reflect its income. We agree with respondent. Since a taxpayer's inventory valuation constitutes a method of accounting, the treatment of inventories for tax purposes is governed by sections 446[12] and *549 471. Hamilton Industries, Inc. v. Commissioner, 97 T.C. 120, 128 (1991); Rockwell International Corp. v. Commissioner, 77 T.C. 780, 808 (1981), affd. 694 F.2d 60 (3d Cir. 1982); Thor Power Tool Co. v. Commissioner, 64 T.C. 154, 165-166 (1975), affd. 563 F.2d 861 (7th Cir. 1977), affd. 439 U.S. 522 (1979). Sections 446 and 471 grant the Commissioner broad discretion in matters of inventory accounting and give the Commissioner wide latitude to adjust a taxpayer's method of accounting for inventory so as to clearly reflect income. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979); Thomas v. Commissioner, 92 T.C. 206, 220 (1989). For tax purposes the requirement that a method of accounting clearly reflect income is paramount. Thor Power Tool Co., supra at 538-544; Thomas, supra at 220. Even if a method of accounting comports with generally accepted accounting principles, where such method does not clearly reflect income, *550 such method will not control for tax purposes. Thor Power Tool Co. v. Commissioner, 439 U.S. at 538-544; Hamilton Industries, Inc. v. Commissioner, 97 T.C. at 128; Sandor v. Commissioner, 62 T.C. 469, 477 (1974), affd. 536 F.2d 874 (9th Cir. 1976). The Commissioner's determination with respect to clear reflection of income is entitled to more than the usual presumption of correctness, and the taxpayer *551 bears a heavy burden of overcoming a determination that a method of accounting does not clearly reflect income. Hamilton Industries, Inc. v. Commissioner, 97 T.C. at 128; Rotolo v. Commissioner, 88 T.C. 1500, 1513-1514 (1987). Whether a particular method of accounting clearly reflects income is a question of fact which must be decided on a case-by-case basis. Peninsula Steel Products & Equipment Co. v. Commissioner, 78 T.C. 1029, 1045 (1982). Section 1.471-1, Income Tax Regs., provides that "In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income producing factor." Section 471[13] provides the general rule requiring that inventories be maintained "on such basis as the Secretary may prescribe" in order to clearly reflect income. Section 1.471-2(a), Income Tax Regs., states: Section 471 provides two tests to which each inventory must conform: (1) It must conform as nearly as may be to the best accounting practice in the trade or business, *552 and (2) It must clearly reflect the income.
Section 472(a)[14]authorizes the use of the LIFO method of accounting subject to the condition that the electing taxpayer abide by "such regulations as the Secretary may prescribe as necessary in order that the use of such method may clearly reflect income". Section 1.472-2(h), Income Tax Regs., provides: The records and accounts employed by the taxpayer in keeping his books shall be maintained in conformity with the inventory method referred to in section 1.472-1; and such supplemental and detailed inventory records shall be maintained as will enable the District *553 Director readily to verify the taxpayer's inventory computations as well as his compliance with requirements of section 472 and sections 1.472-1 through 1.472-7.
Section 1.472-8(e), Income Tax Regs., sets forth the authorized methods of computation for the LIFO value of a dollar-value pool. Addressing the authorized methods, the regulation provides: A taxpayer may ordinarily use only the so-called 'double-extension' method for computing the base-year and current-year cost of a dollar-value inventory pool. Where the use of the double-extension method is impractical, because of technological changes, the extensive variety of the items, or extreme fluctuations in the variety of the items, in a dollar-value pool, the taxpayer may use an index method for computing all or part of the LIFO value of the pool. An index may be computed by double-extending a representative portion of the inventory in a pool or by the use of other sound and consistent statistical methods. * * *
*554 Pursuant to section 1.472-3(d), Income Tax Regs., [15] the Commissioner has the discretion to approve or reject a taxpayer's application for the adoption and use of the LIFO inventory method. Thereunder, the Commissioner also possesses the discretion to examine the electing taxpayer's tax returns and books and records pertaining to the LIFO method utilized in order to determine whether the taxpayer will be permitted to continue to utilize the LIFO method elected. Id.
Revenue Procedure 79-23, 1979-1 C.B. 564, provides for the disallowance or termination of a *555 LIFO election when the taxpayer has failed to maintain adequate books and records with respect to its LIFO inventory and all computations incident thereto. See also section 446(b). The Commissioner's determination as to the proper method of accounting for inventory must be upheld unless shown to be plainly erroneous. Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 271 (1930); Hamilton Industries, Inc. v. Commissioner, 97 T.C. at 129. In 1970, the Company voluntarily elected to utilize the LIFO method of inventory. When the Company made that election, it agreed to keep detailed inventory records which would comply with section 472 and sections 1.472-1 and 1.472-8, Income Tax Regs. The Company further agreed to compute its inventory utilizing the specific LIFO method originally elected on Form 970. The Company, however, did not keep detailed inventory records as contemplated by section 472 and sections 1.472-1 and 1.472-8, Income Tax Regs. Nor did it compute its inventory utilizing the specific LIFO method originally elected on Form 970. It did not use the value of the current quantities in ending inventories *556 as it had elected to do, but instead it used each prior year's ending inventory value and each prior year's corresponding base-year cost in developing its index percentage. The use of prior year ending inventory values resulted in an inaccurate cost calculation of the current year ending inventory which caused a distortion of income. See, e.g., Wendle Ford Sales, Inc. v. Commissioner, 72 T.C. 447, 453-454 (1979); Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 722-724 (1981). Because the Company failed to keep adequate books and records relating to its LIFO inventory method and failed to properly develop its index percentage, the LIFO method utilized by the Company did not clearly reflect its income. Because the LIFO method employed by the Company did not clearly reflect income, such method fell short of being an acceptable adaptation of the LIFO method originally elected by the Company in 1970. Accordingly, respondent has the authority to terminate the Company's LIFO method of inventory as of January 1, 1980. On brief, petitioners argue that "All differences between the Company's computation of LIFO and Respondent's *557 computation of LIFO are merely timing differences which, when consistently observed, do not distort income." We find this argument unpersuasive. The Company's own recomputations of the LIFO reserve for Pool #2 for 1981 reflected a substantial variance from the amount originally shown on the return filed for that year. The difference between the reported reserve (approximately $ 2,400,000) and the recomputed reserve (approximately $ 1,200,000) was approximately $ 1,200,000. Petitioners' other arguments on this issue are also without merit. Respondent is not estopped from terminating the Company's LIFO election on the ground that no adjustments thereto were proposed during earlier examinations of the Company's tax returns for the years in issue and prior years. Petitioners did not establish that the scope of the prior examinations included any analysis of the Company's LIFO methods. Further, we have consistently held that respondent's mere acquiescence in the treatment of an item in prior years does not preclude future adjustment in later years. Meneguzzo v. Commissioner, 43 T.C. 824, 836 (1965); Massaglia v. Commissioner, 33 T.C. 379, 386-387 (1959), *558 affd. 286 F.2d 258 (10th Cir. 1961); South Chester Tube Co. v. Commissioner, 14 T.C. 1229, 1235 (1950). Martin's Inc. v. Commissioner, T.C. Memo. 1987-419, affd. without published opinion 855 F.2d 857 (8th Cir. 1988). Petitioners' assertion that respondent's termination of the LIFO method constitutes an abuse of administrative discretion and is arbitrary and unreasonable is without merit. Petitioners did not offer a shred of evidence to support this accusation. When, as in the instant case, the taxpayer's inventory accounting method does not clearly reflect income, respondent may require the taxpayer to use a method that clearly reflects income even without a showing of bad faith on the part of the taxpayer. Commissioner v. Joseph E. Seagram & Sons, Inc., 394 F.2d 738, 743 (2d Cir. 1968), revg. 46 T.C. 698 (1966); sec. 1.472-3(d), Income Tax Regs.
In conclusion, we hold that respondent properly terminated the Company's LIFO method of inventory accounting. Issue 7. Section 6653(b) -- Fraud
Beginning *559 before H.E. Boecking, Jr. purchased the Company in 1962, the Company made kickback payments to many county commissioners throughout the State of Oklahoma. The kickbacks were made in an effort to persuade the county commissioners to purchase equipment, parts, and services from the Company. During 1979, 1980, and 1981, the Company made 31 kickback payments to the county commissioners; the kickbacks were made in the following manner. First, the Company gave a check to the salesmen making the kickback in the amount of the kickback to the county commissioner. For both financial accounting and tax purposes, the Company treated the kickback as part of that particular salesman's compensation. Next, the salesman cashed the check and delivered the proceeds to the participating county commissioner. The salesman reported the kickback as compensation on his personal tax return. The Company paid all State and Federal income taxes due from the salesman on that compensation; the salesman received credit for the taxes paid by the Company. Finally, the Company deducted the amount of the kickback as compensation to the salesman. H.E. Boecking, Jr. knew about the kickbacks, and the manner in *560 which they were executed. Yet, he did nothing to stop them, and in fact admitted that he approved of such illegal activity. H.E. Boecking, Jr. and three of the Company's salesmen were charged with conspiring to defraud the United States and certain Oklahoma Counties in violation of 18 U.S.C. section 371 (1988). The acts specified in the Documents of Information were as follows: Impeding the collection of the Company's corporate income taxes, impeding the collection of the county commissioners' personal income taxes, and using the mails to procure the counties' purchases of equipment from the Company. In 1984, H.E. Boecking, Jr. and the three salesmen pled guilty to these charges. [16]
During the audit of the Company's tax returns, the Company cooperated with the examining agent *561 and allowed the agent access to all business records. Respondent argues that at least a portion of the underpayment of tax required to be shown on each of the Company's 1979, 1980, and 1981 corporate income tax returns was due to fraud. In the alternative, respondent argues that the Company's underpayments were due to negligence. Petitioners argue that no part of the Company's underpayments of tax for those years was due to fraud. We sustain respondent's fraud adjustment; therefore, we need not consider respondent's alternative negligence argument. Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); [17]Rule 142(b). Section 6653(b) provides that "If any part of the underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." In order to prove that an underpayment is due to fraud, respondent must show that the taxpayer intended to evade a tax known to be owing by conduct designed to conceal, mislead, or otherwise prevent the collection of such tax by respondent. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), *562 affg. T.C. Memo. 1985-148; Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). In determining whether a corporation had a fraudulent intent, the intent of the corporation's president and sole owner is imputed to the corporation. Auerbach Shoe Co. v. Commissioner, 21 T.C. 191, 194 (1953), affd. 216 F.2d 693 (1st Cir. 1954). The existence of fraudulent intent is a factual question to be decided on the basis of an examination of the entire record. Recklitis v. Commissioner, supra at 909; Grosshandler v. Commissioner, 75 T.C. 119 (1980). *563 Fraud may never be presumed but must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Because direct proof of a taxpayer's intent is rarely available, fraud may be established by circumstantial evidence. Grosshandler. v. Commissioner, supra at 19; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). The following indicia (or badges) of the Company's fraud are found to be present in this case: (1) Understating income; (2) maintaining inadequate books and records; (3) engaging in illegal activities; (4) attempting to conceal such illegal activities; and (5) dealing in cash. Meier v. Commissioner, 91 T.C. 273, 297-298 (1988). Petitioners do not dispute that H.E. Boecking, Jr.'s fraudulent intent, to the extent it may exist, should be imputed to the Company. We find that Mr. Boecking knew the deductions for the kickbacks, which were disguised as compensation, would not be allowed. Pigman v. Commissioner, 31 T.C. 356, 371-372 (1958); *564 Estate of Briden v. Commissioner, 11 T.C. 1095, 1134-1135 (1948), affd. sub nom. Kirk v. Commissioner, 179 F.2d 619 (1st Cir. 1950). The only indicium of fraud weighing against a finding of fraudulent intent is the Company's cooperation with the examining agent during the audit. Weighing all these indicia of fraud, we hold that respondent has met the requisite burden of proving that H.E. Boecking, Jr. and thus the Company, intended to evade the payment of the Company's Federal taxes known to be owing for 1979, 1980, and 1981 by conduct intended to conceal, mislead, and otherwise prevent the collection of such taxes. [18] Part of the Company's underpayment of tax in each year was due to fraud with intent to evade tax. We therefore sustain respondent's determination of the additions to tax for fraud under section 6653(b) for 1979, 1980, and 1981. *565 Issue 8. Section 6653(a) -- Negligence
For each of the years in issue, section 6653 imposes an addition to tax where the taxpayer's underpayment is due to negligence or intentional disregard of rules or regulations (hereinafter referred to as negligence). For purposes of this statute, "negligence is the lack of due care or failure to do what a reasonable and prudent person would do under the circumstances". Neely v. Commissioner, 85 T.C. 934, 947 (1985). Section 6653(a) (effective during taxable year 1980), section 6653(a)(1) (effective during taxable years 1981 through 1985), and section 6653(a)(1)(A) (effective during taxable year 1986) impose an addition to tax equal to 5 percent of the entire underpayment if any portion of the underpayment is due to negligence. Section 6653(a)(2) (for returns due before 1987) and section 6653(a)(1)(B) (for returns due after 1986, but before 1989) provide that there shall be added to the tax (in addition to the aforementioned 5 percent) an amount equal to 50 percent of the interest payable under section 6601 with respect to that portion of the underpayment due to negligence. Respondent determined *566 that the entire underpayment for the Company's taxable year 1982 is due to negligence. Respondent also determined that if the Company's underpayments for 1979, 1980, and 1981 are not found to be due to fraud, the entire underpayments for such years are due to negligence. Respondent further determined that at least a portion of each of Mr. & Mrs. H.E. Boecking, Jr.'s underpayments for 1980, 1981, 1982, 1983, 1984, and 1986 is due to negligence. Respondent finally determined that at least a portion of Mr. & Mrs. H.E. Boecking III's underpayments for 1984 and 1985 are due to negligence. We have found that at least a portion of each of the Company's underpayments for 1979, 1980, and 1981 is due to fraud. Thus, respondent's negligence determination with respect to these underpayments goes by the wayside. We now turn to respondent's remaining negligence determinations. A. The Company
With regard to respondent's determination that the Company's underpayment of the tax due for 1982 is due to negligence, petitioners have not met their burden of proving such determination erroneous. Petitioners offered no evidence to show respondent's determination erroneous, and in fact they *567 did not discuss this issue on brief. B. Mr. & Mrs. H.E. Boecking, Jr.
With regard to respondent's determination that at least a portion of Mr. & Mrs. H.E. Boecking, Jr.'s underpayments for taxable years 1980, 1981, 1982, 1983, 1984, and 1986 is due to negligence, again petitioners have not met their burden of proving such determination erroneous. As to the amounts which H.E. Boecking, Jr. concedes were constructive dividends, petitioners argue that their reliance on an independent certified public accountant negates a finding of negligence. We find this contention to be without merit. Although petitioners advance this theory on brief, the record is devoid of evidence to support such a conclusion. While Mr. Boecking offered extensive testimony with respect to a number of issues, he did not testify that he relied on the advice of any tax professional when authorizing certain transactions which were later conceded to be constructive dividends. Sally Boecking did not testify. Finally, although the certified public accountant who prepared all of petitioners' tax returns, Omer Peters, testified on behalf of petitioners, his testimony was limited to the LIFO issue. With regard *568 to the underpayments which resulted from unconceded adjustments, petitioners failed to introduce specific evidence in support of their assertion that such underpayments were not due to negligence. Accordingly, except with respect to the Company's taxable years 1979, 1980, and 1981, respondent's determinations as to the additions to tax for negligence are sustained. C. Mr. & Mrs. H.E. Boecking III
Respondent determined that at least a portion of Mr. & Mrs. H.E. Boecking III's underpayments for taxable years 1984 and 1985 is due to negligence. Mr. & Mrs. Boecking III stipulated that their individual income tax returns for the years 1984 and 1985 were not filed within the time prescribed by law. Such failure to timely file constitutes negligence unless petitioners can show reasonable cause for the delinquency. Emmons v. Commissioner, 92 T.C. 342, 349 (1989), affd. 898 F.2d 50 (5th Cir. 1990). Here, petitioners' assertion that errors on the part of their tax preparers led to the tardiness of their returns, is vague and unpersuasive. Accordingly, we find that Mr. & Mrs. H.E. Boecking III are liable for the section 6653(a)(1) *569 negligence additions for 1984 and 1985. Mr. & Mrs. H.E. Boecking III are not liable, however, for the section 6653(a)(2) negligence additions to tax asserted by respondent. While under sections 6653(a)(1) and 6655(c) tax payments made through withholding do not reduce the base on which the negligence addition is imposed, see Emmons v. Commissioner, supra, sections 6653(a)(2) and 6601(f) do not impose an addition to tax where a tax liability is deemed discharged because tax payments made through withholding exceed any tax underpayment during the relevant period. See discussion of Issue 10, infra. Issue 9. Section 6661 -- Substantial Understatement of Income Tax
Section 6661(a) imposes additions to tax on that portion of any underpayment attributable to a substantial understatement of income tax. A substantial understatement is defined as an amount that exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). The understatement is reduced to the extent it is based on substantial authority or is adequately disclosed on the return or in a statement attached to the return. Sec. *570 6661(b)(2)(B). Respondent determined that Mr. & Mrs. H.E. Boecking, Jr. are liable for the substantial understatement addition for 1982, 1983, 1984, and 1986. Respondent also determined that Mr. & Mrs. H.E. Boecking III are liable for the substantial underpayment addition for 1984. Since we determined that Mr. & Mrs. H.E. Boecking III did not underpay their 1984 taxes, they obviously are not liable for the substantial underpayment addition to tax for 1984. [19]
Based on our findings herein, it is apparent that there are substantial understatements of Federal income tax with respect to Mr. & Mrs. H.E. Boecking, Jr. for 1982, *571 1983, 1984, and 1986. They failed to establish that their understatements should be reduced under section 6661(b)(2)(B). In this regard, first, there is no substantial authority, as defined under section 6661(b)(2)(B)(i), for their failure to include in gross income the various items determined to be constructive dividends received during the years in issue, nor is there substantial authority for their failure to include in gross income the gain realized upon the complete liquidation of the Company. Their arguments to the contrary are inapposite. Second, they did not make adequate disclosure within the meaning of section 6661(b)(2)(B)(ii). Furthermore, we note, they did not present any evidence or argument regarding adequate disclosure. Accordingly, respondent's determinations as to the additions to tax for substantial understatements of income tax with respect to Mr. & Mrs. H.E. Boecking, Jr. are sustained. Issue 10. Section 6651 -- Failure to Timely File
Section 6651 imposes additions to tax for failure to file a tax return or to pay any tax owing by the applicable due date. Under section 6651(a), the addition to tax is based upon a percentage of the amount of tax *572 required to be shown on the return. When computing the addition to tax, the amount of tax required to be shown should be reduced by the amount of tax which had been paid before the return was originally due. Sec. 6651(b). Respondent determined that Mr. & Mrs. H.E. Boecking III are liable for the section 6651 addition for taxable years 1984 and 1985. Mr. & Mrs. H.E. Boecking III stipulated that they filed their individual income tax returns for taxable years 1984 and 1985 on July 16, 1986, which was later than the time prescribed by law. However, we have held that respondent incorrectly determined that Mr. & Mrs. H.E. Boecking III had tax deficiencies for taxable years 1984 and 1985. As a result, their tax liability for 1984 was $ 8,892 and for 1985 it was $ 8,765 (the amounts reported on their returns). In the notice of deficiency issued to Mr. & Mrs. Boecking III, respondent determined that they made tax payments in the amount of $ 12,792 on or before the due date of their 1984 tax return and tax payments in the amount of $ 11,704 on or before the due date of their 1985 tax return. Pursuant to section 6651(b), the amount of tax required to be shown on the return ($ 8,892 *573 for 1984 and $ 8,765 for 1985) must be reduced by the amount of tax which had been paid on or before the date each respective return was originally due ($ 12,792 for 1984 and $ 11,704 for 1985). Since the addition to tax under section 6651(a) is computed based upon the net amount required to be shown, which in this case is $ 0 for each year, no addition to tax is due. Harris v. Commissioner, 51 T.C. 980, 987 (1969); see also sec. 301.6651-1, Income Tax Regs.[20]
To reflect the foregoing and concessions by the parties, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Boecking Machinery, Inc., docket No. 6269-90; H.E. Boecking III and Sharon F. Boecking, docket No. 8489-90; and H.E. Boecking, Jr. and Sally Boecking, docket No. 18404-90.↩
1. 50 percent of interest payable on $ 42,666.↩
1. 50 percent of the interest payable on the entire deficiency.↩
1. 50 percent of the interest payable on $ 1,225,896.↩
1. 50 percent of the interest payable on $ 33,360 for 1984 and $ 4,382 for 1985.↩
1. Neither petitioners nor respondent presented oral testimony with regard to the $ 3,458 interest item. Nor did they discuss this item in their briefs. Petitioners bear the burden of proving that respondent erred in determining that this item constitutes a constructive dividend. Based on petitioners' failure to either present testimony or to brief this item, we deem petitioners to have conceded that this item constitutes a constructive dividend.↩
2. Petitioners argue that respondent's adjustments are incorrect because they do not reflect a number of repayments made by Mr. Boecking during the years in issue. Petitioner asserts that such repayments, if properly credited, would have reduced the respective loans to shareholder account balances chargeable to Mr. Boecking. Petitioners' contention is based upon documents which are not a part of the record. We, therefore, reject petitioners' argument. Further, to the extent that the account balances reflect those figures appearing in the Company's audited financial statements, we find petitioners' assertion that the figures do not reflect all payments made by Mr. Boecking incredible.↩
3. SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) IN GENERAL. -- Except as otherwise provided in this chapter, a distribution of property * * * made by a corporation with respect to its stock shall be treated in the manner provided in subsection (c). * * * (c) AMOUNT TAXABLE. -- In the case of a distribution to which subsection (a) applies -- (1) AMOUNT CONSTITUTING DIVIDEND. -- That portion of the distribution which is a dividend (as defined in section 316↩) shall be included in gross income.
4. SEC. 316. DIVIDEND DEFINED. (a) GENERAL RULE. -- For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders -- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year * * * without regard to the amount of the earnings and profits at the time the distribution was made.↩
5. The financial records admitted into evidence revealed that the Company had accumulated earnings for the years in issue as follows: ↩
12/31/79
$  6,675,209
12/31/80
8,480,995
12/31/81
11,933,679
12/31/82
10,838,068
12/31/83
4,928,411
12/31/84
6,811,525
6. We are mindful that the Company made loans to employees other than H.E. Boecking, Jr. during each year in issue. However, except for two loans of under $ 10,000 to Mr. Boecking's sons and a $ 12,000 loan to the head janitor who was described as a "special person", the amount of Company loans to employees other than Boecking family members was no greater than $ 250 each.↩
7. During 1984 and 1985, H. E. Boecking III was a shareholder of the Company.↩
8. SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS. (a) DISTRIBUTIONS IN COMPLETE LIQUIDATION TREATED AS EXCHANGES. -- Amounts received by a shareholder in a distribution in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.↩
9. SEC. 1.331-1. CORPORATE LIQUIDATIONS. * * * (b) The gain or loss to a shareholder from a distribution in partial or complete liquidation is to be determined under section 1001↩ by comparing the amount of the distribution with the cost or other basis of the stock. * * *
10. SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS. (a) COMPUTATION OF GAIN OR LOSS. -- The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis * * * (b) AMOUNT REALIZED. -- The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *↩
11. We are mindful that since the Supreme Court's decision in Arrowsmith v. Commissioner, 344 U.S. 6 (1952), this Court has consistently held that a shareholder-transferee of corporate assets who pays income tax deficiencies of the dissolved corporation can not retroactively reduce the gain from the liquidation as reported in prior years. See Abdalla v. Commissioner, 69 T.C. 697 (1978), affd. 647 F.2d 487 (5th Cir. 1981); Schneider v. Commissioner, 65 T.C. 18 (1975); James Armour, Inc. v. Commissioner, 43 T.C. 295 (1964); Heiderich v. Commissioner, 19 T.C. 382 (1952); Pittman v. Commissioner, 14 T.C. 449 (1950). We believe Arrowsmith↩ and the aforementioned cited cases are distinguishable from the instant case.
12. SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING. (a) GENERAL RULE. -- Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. (b) EXCEPTIONS. -- If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.↩
13. SEC. 471. GENERAL RULE FOR INVENTORIES. Whenever in the opinion of the Secretary the use of inventories is necessary in order to clearly determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.↩
14. SEC. 472. LAST-IN, FIRST-OUT INVENTORIES (a) AUTHORIZATION. -- A taxpayer may use the method provided in subsection (b) * * * in inventorying goods specific in an application to use such method filed at such time and in such manner as the Secretary may prescribe. The change to, and the use of, such method shall be in accordance with such regulations as the Secretary may prescribe as necessary in order that the use of such method may clearly reflect income.↩
15. SEC. 1.472-3. Time and manner of making election. * * * (d) Whether or not the taxpayer's application for the adoption and use of the LIFO inventory method should be approved, and whether or not such method, once adopted, may be continued and the property of all computations incidental to the use of such method, will be determined by the Commissioner in connection with the examination of the taxpayer's income tax returns.↩
16. H.E. Boecking, Jr. testified that he did not recall the tax evasion charges; however, such charges plainly appeared in the Documents of Information and on the Judgment and Probation/Commitment Order.↩
17. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) FRAUD. -- In any proceeding involving the issue whether petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary.↩
18. Petitioners assert four explanations to justify their argument that the Company lacked fraudulent intent. First, petitioners argue that the disguise of the kickbacks was intended to solely avoid criminal prosecution under Oklahoma's anti-kickback statutes, not to evade paying corporate income taxes. This argument is wholly without merit. The Supreme Court has stated that, with respect to criminal tax fraud, "If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime." Spies v. United States, 317 U.S. 492, 499 (1943) (emphasis added). And we are mindful that the burden of proof for criminal tax fraud is a higher standard than the burden of proof for civil tax fraud. Second, petitioners argue that because the total dollar amount of the kickbacks was only a small fraction of the Company's annual sales, the Company lacked fraudulent intent. This assertion borders on the frivolous. Third, petitioners argue that H.E. Boecking, Jr. lacked fraudulent intent because the net result of the kickback scheme may have actually increased the Company's total corporate tax burden. Petitioners failed, however, to marshall any facts to support this creative assertion. Fourth, petitioners point out that the Company made kickbacks even before H.E. Boecking, Jr. purchased it in 1962. Petitioners appear to argue that such prior activity negates any fraudulent intent. We find this argument unpersuasive.↩
19. Section 6661(b)(2)(A), unlike sec. 6653(c), defines an understatement as the "amount of the tax required to be shown on the return" over the "amount of the tax imposed which is shown on the return" (or the amount of tax which is paid through withholding), irrespective of whether the return is timely filed. See Woods v. Commissioner, 91 T.C. 88, 92-99↩ (1988).
20. The so-called minimum penalty imposed by the flush language at the end of sec. 6651(a) does not apply. See Patronik-Holder v. Commissioner, 100 T.C. 374↩ (1993).