## DRAVO CORPORATION
### v.
### The UNITED STATES.
### No. 381-60.

United States Court of Claims.
July 16, 1965.

Herbert L. Awe, Washington, D. C., for plaintiff; Thomas E. Jenks, Washington, D. C., attorney of record. John P. Lipscomb and Alfred M. Osgood, Washington, D. C., of counsel.

Philip R. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. C. Moxley Featherston, Lyle M. Turner, and Conrad T. Hubner, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

LARAMORE, Judge.

This is an action for the recovery of income and excess profits taxes for the year 1953 and for the recovery of income taxes for the year 1955. There are two distinctly unrelated issues in this case, each based upon independent factual situations and different provisions of law. The first question for determination is whether plaintiff, a taxpayer reporting

income for Federal income tax purposes on the accrual basis of accounting, should accrue and take as a deduction for the year 1953 an additional amount of Pennsylvania capital stock tax with respect to the year 1953 determined to be due by the state authorities in 1956 and paid by plaintiff in the same year without protest. The second question concerns the proper percentage depletion deduction to be taken by plaintiff in 1955 for Federal income tax purposes with respect to plaintiff's sand and gravel operations.

For the reasons given below, we hold for plaintiff on the first issue and for defendant on the second.

### I. *Pennsylvania Capital Stock Accrual Issue*

Taxpayer is a Pennsylvania corporation which maintains its accounts and files its Federal tax returns on the accrual basis using a calendar year period. As a Pennsylvania corporation it was required to pay to that state a tax commonly known as a capital stock tax.

Pennsylvania, during the years in question, had a self-assessment procedure whereby domestic corporations subject to the tax were required to value their capital stock and pay a tax thereon at a prescribed rate. In 1954 taxpayer filed with the proper authorities its capital stock report indicating that the value of its stock as of the end of 1953 was $23,000,000 and that the capital stock tax due thereon for the 1953 calendar year was $82,461.33, which amount was remitted to the Commonwealth of Pennsylvania at the same time.

The Pennsylvania Department of Revenue had a statutory duty to notify each capital stock taxpayer within the calendar year during which the return was filed as to whether or not it accepted the valuation placed on the stock. This notification was known as a "settlement".

On July 20, 1954, the Department accepted the taxpayer's valuation of the worth of its stock as of the end of 1953 and so notified it.

The taxpayer, which was on the accrual basis, deducted the entire amount of the capital stock tax for 1953 ($82,461.33) on its Federal income tax return for its 1953 calendar tax year.

By statutory authority, the Department of Revenue was authorized to reexamine and to reopen any "settlement" within two years after it was made and to redetermine the value of a taxpayer's capital stock and the capital stock tax attributable thereto. In 1956, the Commonwealth taxing officials reviewed the 1953 capital stock tax report of plaintiff and determined that plaintiff did not correctly reflect on its balance sheet the actual value of the shares of its subsidiaries. The revaluation by taxing officials increased the value of the taxpayer's capital stock to $32,000,000 with a resulting increase in the capital stock tax attributable to 1953 to $114,728.72, leaving a balance owing of $32,267.39 over the amount previously paid. By notice mailed on August 27, 1956, the tax authorities notified the taxpayer of the results of their revaluation. On September 11, 1956, the taxpayer paid the additional $32,267.39 to the Commonwealth without appeal or protest.

On June 1, 1959, the taxpayer filed a claim for refund of its Federal income taxes for 1953 on the grounds that the additional capital stock tax attributable to 1953, which was paid in 1956, was deductible in 1953. The claim for refund was disallowed and this suit followed.

█ The question of when items accrued for Federal income tax purposes has been the subject of extensive litigation and many decisions. From them emerge a series of simple propositions which determine the appropriate period for reflecting items of income and expense. We start with the admonition that in order for tax accrual accounting to provide a meaningful picture of operations, the expense items or deductions must be included in the same period as the income items they help to produce. In other words, interrelated items of expense and income must be "matched" in some particular period. United States v. Anderson, 269 U.S. 422, 440, 46 S.Ct. 131, 70 L.Ed. 347 (1926). To achieve this re-

sult the Supreme Court in Anderson, supra at 441, 46 S.Ct. 131, devised what is now called the "all events test" whereby an accrual basis taxpayer may deduct taxes or any other expense items if all the events fixing the fact of, and the amount of, the taxpayer's liability have transpired though not paid. This requires that "each 'taxable year' must be treated as a separate unit, and all items of gross income and deductions must be reflected in terms of their posture at the close of such year." United States v. Consolidated Edison Co., 366 U.S. 380, 384, 81 S.Ct. 1326, 1329, 6 L.Ed.2d 356 (1961); Security Flour Mills Co. v. Commissioner of Internal Revenue, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725 (1944). The Supreme Court somewhat departed from this traditional concept of accrual accounting when it added a refinement to the "all events test" by its holding in Dixie Pine Products Co. v. Commissioner of Internal Revenue, 320 U.S. 516, 519, 64 S.Ct. 364, 365, 88 L.Ed. 270 (1944), that an accrual-basis taxpayer could not, while "contesting liability in the *courts*," deduct "the amount of the tax, on the theory that the state's exaction constituted a fixed and certain liability" but "must, in the circumstances, await the event of the state court *litigation* and might claim a deduction only for the taxable year in which its liability for the tax was finally adjudicated." [Emphasis added.] The concept of contest since Dixie Pine has been expanded not only to include litigation in the courts but also a dispute formally lodged with the tax authorities. E. g., G.C.M. 25298, 1947–2 Cum.Bull. 39; Southwest Exploration Co. v. Riddell, 232 F.Supp. 13, 20 (S.D.Cal.1964) (dicta); Great Island Holding Corp., 5 T.C. 150 (1945).

In the instant case the government wants us to expand this concept by finding a "contest" for purposes of the rule enunciated in Dixie Pine, where a taxpayer merely files a state tax return acknowledging a liability in a stated amount since this "entails a denial by the taxpayer that it owes an amount of tax greater than that specified on the return." In support of this contention the government relies on Southwest Exploration Co. v. Riddell, supra; Agency of Canadian Car & Foundry Co., 39 T.C. 15 (1962); Gunderson Bros. Engineering Corp., 16 T.C. 118 (1951); Great Island Holding Co., supra, (dicta); Rev. Rul. 57–105, 1957–1 Cum.Bull. 193 (modified by Rev.Rul. 59–59, 1959–1 Cum.Bull. 97).

Contrary to the government's position taxpayer cites National Forge & Ordnance Co. v. United States, 141 Ct.Cl. 880, 158 F.Supp. 860 (1958); Montgomery v. United States, 87 Ct.Cl. 218, 23 F.Supp. 130 (1938), cert. denied, 307 U.S. 632, 59 S.Ct. 833, 83 L.Ed. 1514 (1939); Colt's Mfg. Co., 35 T.C. 78 (1960); Jack M. Chesbro, 21 T.C. 123 (1953); Gulf States Utilities Co., 16 T.C. 1381 (1951); H. E. Harman Coal Corp., 16 T.C. 787 (1951); Standard Paving Co., 13 T.C. 425 (1949), aff'd on other issues, 190 F.2d 330 (10th Cir. 1951), cert. denied, 342 U.S. 860, 72 S.Ct. 87, 96 L.Ed. 647 (1951); Burton-Sutton Oil Co., Inc., 3 T.C. 1187 (1944), aff'd in part and rev'd in part on other grounds, 150 F.2d 621 (5th Cir. 1945), rev'd on other grounds, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062 (1946); Oregon Pulp & Paper Co., 47 B.T.A. 772 (1942).

The government argues that the mere filing of a state tax return acknowledging a liability in a stated amount is a "contest" since that entails a denial by the taxpayer that it owes an amount of tax greater than that specified on the return. By the same token, the argument can be made that a taxpayer in a self-assessment situation remits what he thinks is the proper amount but acknowledges that a greater amount might be due and levied by the taxing authorities. We do not think it proper to extend the concept of "contest" to the instant situation where the only basis for such an extension is taxpayer's subjective motive as to what was intended when a return was filed. If a departure from the traditional concepts of proper accrual tax accounting is required by the fact of con-

test,[1] it should be evidenced by taxpayer's objective acts; i. e., lodging a formal protest with the tax authorities or instituting a suit in a court of law. To conclude otherwise would ignore the principle of an uncontested tax, and equate actual contest with acquiescence without contest. But more important, in order that income may be clearly reflected for any taxable year, it is necessary to reflect the state tax liabilities for that year. When the liability is not disputed and the precise amount is later determined, it is in accordance with sound principles of accounting that the tax accrue in the year in which the liability occurred. The government's position would result in completely distorting taxpayer's income for the years 1956 and 1953.

The government finally argues that if we do not find a contest by a mere filing in a self-assessment situation, taxpayer would be able to choose the year in which the deduction would benefit it the most by merely electing to contest the liability. The same result would be achieved under section 223(a) (1) of the Revenue Act of 1964, supra. Congress did not deem important the tax benefits that a taxpayer could achieve by the election available to him under that section. Therefore, we think that this factor should not be controlling in the instant case.

■ For the foregoing reasons, we hold that the additional capital stock tax paid by plaintiff in 1956 with respect to the year 1953 accrued in 1953. Consequently, plaintiff is entitled to recover on this issue, and the amount of recovery will be determined pursuant to Rule 47(c) (2).

## II. *Percentage Depletion Issue*

Taxpayer has over a period of many years owned and produced sand and gravel from substantial island deposits in the Ohio River. The percentage depletion issue involves sand and gravel which were dredged from such island deposits, transported to its installations on shore, and sold to customers during the year 1955. In taking its percentage depletion deduction on its income tax return for the year, taxpayer computed its depletion allowance by using per ton prices at the dredge. It now contends that its gross income with respect to these sales should be computed by using per ton prices at its installations on shore.

The sand and gravel was extracted from the islands by means of two dredges which would wash and size the extracted material; in addition, one dredge could crush gravel and had a heavy media separation plant which could eliminate the undesired light gravel. After the sand and gravel had been washed and sized on the dredges, it had to be removed from the dredges since stockpiling on the dredges is impossible. This was accomplished by barges which were adjacent to the dredges. The barges belonged either to plaintiff or its customers, depending upon who was the intended purchaser of the material.

During the year 1955 taxpayer's dredges extracted from its island deposits 1,329,597 tons of sand and gravel. Sales of these materials were made to the following four classes of customers:

(1) One class of sales was made to one customer, Standard Sand and Gravel Company, Wheeling, West Virginia. During 1955, taxpayer sold 52,740 tons of sand and gravel to this company. Up

---

1. Congress, through section 223(a) (1) of the Revenue Act of 1964, 78 Stat. 19, 76, 26 U.S.C. § 461(f) (1964 ed.), has stripped the authority from those cases which denied the deductibility of an asserted liability in the year of payment if there was a subsequent contest. E.g., United States v. Consolidated Edison Co., 366 U.S. 380, 81 S.Ct. 1326 (1961). Although we think this amendment has no bearing on the issue at bar, we note it as an example of congressional intent to restrict the effect of the concept of "contest" in tax cases. See S.Rep.No. 830, 88th Cong., 2d Sess. 243 (1964), U.S. Code Cong. and Adm.News 1964, p. 1673; Charles Leich & Co. v. United States, Ct.Cl. Nos. 367–56, 419–56, rehearing denied, 333 F.2d 871 (1964).

until 1947, Standard Sand and Gravel Company had done its own dredging at which time its dredge sank, although it has continued to use its own tugs and barges. Taxpayer has found it worthwhile to sell to this former producer at a lower price than it would sell to anyone else. Standard has called for the material at taxpayer's dredges with Standard's own barges and tugs to transport it for resale in West Virginia. The resale prices in Standard's market have been so low that it could not pay taxpayer the prices ordinarily paid in taxpayer's market.

(2) A second class of sales was made to river producers of sand and gravel who constituted competitors of taxpayer. These competitors owned their own deposits, dredges, tugs and barges. They were J. K. Davison & Bros. and Iron City Sand and Gravel Company. Taxpayer and these competitors established interchange prices for sand and gravel based upon the material being picked up at the dredge, subject to adjustment according to actual method of delivery. The sales were for the convenience of the parties in cases such as breakdown of production equipment or lack of a required specification amount at the time. These prices were higher than those to Standard Sand and Gravel Company but lower than to other customers. During 1955 taxpayer sold 130,646 tons of sand and gravel to these two customers, delivery being made as follows: (a) 47,749 tons picked up by J. K. Davison & Bros. with its barges and tugs at taxpayer's dredges; (b) 18,109 tons delivered by plaintiff's barges and tugs to J. K. Davison & Bros. and to Iron City Sand and Gravel Co.; and (c) 64,788 tons delivered to J. K. Davison & Bros. on Davison's barges by means of taxpayer's tugs.

(3) A third class of sales was made at delivered prices on taxpayer's barges with its own tugs to customers' shore installations. These sales amounted to 460,625 tons. In those instances described in the stipulation where sand and gravel was delivered by barge to a customer's or purchaser's dock, the sand and gravel would be unloaded from the barges by the customer or purchaser and any further processing would be done by them.

(4) The fourth and largest class of sales, amounting to 685,586 tons of sand and gravel, was made by plaintiff from its shore installations or "hoists". It is the percentage depletion deduction with respect to these 685,586 tons with which this case is concerned. When the barges carrying the materials from the dredges arrived at the taxpayer's docks, the sand and gravel would be removed by Whirler Hoists with buckets directly (or by conveyor belts) to large bins or to the stockpiles for future binning. At the bins, the sand and gravel was stored, weighed and from them loaded on to trucks or cars for shipment to customers.

Taxpayer's deck barges used for carrying the sand and gravel away from the dredge were specially equipped with decks higher in the middle than on the sides and with "weep holes" in the sides of the cargo boxes to provide for drainage of water from the sand and gravel. Thus during the trip from the dredges to taxpayer's shore installations the water content of the sand and gravel would be appreciably reduced.

Under the Internal Revenue Code of 1954, applicable to the tax year 1955 which is here in question, Congress provided in section 611 that:

> * * * In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case * * *.

Section 613 of the Code provides for a deduction based on "percentage depletion," and taxpayer for the years in issue, as well as in other years, computed its depletion deduction under this section.

Under section 613(b) (5) sand and gravel is entitled to a five percent depletion allowance. The percentage is ap-

plied to the "gross income from the property" which is defined in section 613(c) as follows:

* * * For purposes of this section—

(1) Gross Income from the Property.—The term "gross income from the property" means, in the case of a property other than an oil or gas well, the gross income from mining.

(2) Mining.—The term "mining" includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores and minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary or his delegate finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills.

* * * * * *

(4) Ordinary Treatment Processes.—The term "ordinary treatment processes" includes the following:

* * * * * *

(C) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment * * *.

The sales of sand and gravel with which this case is concerned consist of the largest class of sales made by taxpayer, namely, that tonnage sold and loaded for shipment at taxpayer's plant installations on shore, commonly known as "hoists". The issue here is whether taxpayer is entitled to take into account for depletion purposes the cost of transportation of the sand and gravel from the dredge to its plant installations on shore, its stockpiling costs, and its loading costs for shipment to customers, all of which are reflected in the price at the "hoist". This, in turn, depends on whether these processes, beyond the dredge, are "ordinary treatment processes," as above defined.

Taxpayer contends that all processes applied to the sand and gravel up to the point of sale from its shore installations or "hoists" were "ordinary treatment processes" as defined in the statute. Taxpayer then argues that being "ordinary treatment processes" allowed by statute, depletion should be based on actual sales, whether prior to the completion of such processes or upon their completion, i. e., the actual "gross income" from the property. Defendant argues that once marketability exists, a taxpayer is not entitled to the benefit of any additional ordinary treatment processes even though *permitted* by statute. In other words, as a matter of statutory construction, the government argues that the statutory phrase "commercially marketable mineral product or products" restricts the permissible "ordinary treatment processes normally applied by mineowners." The effect of defendant's argument is that if a miner of a mineral were to sell any portion of his annual production prior to applying all the processes permitted by statute, its gross income from the entire property would be based on that price. We believe that neither Congress nor the Supreme Court in United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960) intended such a result.

We think that the fact that taxpayer sold almost half of its production at the dredge is of no consequence, if in fact, taxpayer performed "ordinary treatment processes" beyond the dredge. To hold otherwise would cause the discrimination which the Cannelton decision intended to prevent. Thus the question

which we must decide is whether the processes taxpayer performed, beyond the dredge, are "ordinary treatment processes" as defined by statute. This in turn depends on whether the mined product after the processes on the dredge were completed was ready for *ordinary* industrial use or consumption and had thus passed the mining stage. Food Machinery & Chemical Corp. v. United States, Ct.Cl. No. 357–59, this day decided; Morton Salt Co. v. United States, 161 Ct.Cl. 640, 648, 316 F.2d 931, 936 (1963). It is with respect to this question that taxpayer's sales at the dredge become significant as one of the factors which would indicate that the mined minerals were ready for ordinary industrial use or consumption. In other words, if the purchasers of the minerals at the dredge had to apply what the statute defines as "ordinary treatment process" on the minerals before the minerals were ready for ordinary industrial use or consumption, then the cut-off point for depletion purposes for the other sales is not at the dredge but at a subsequent point. This would be true also if the purchaser had a special use for the mined mineral in a "crude" state vis-a-vis fully processed in the statutory sense. The presence of these factors would negate the inference to be drawn from the sales that the raw product was in a state ready for ordinary industrial use or consumption. In their absence, these sales at the dredge are strong indicators that what taxpayer did beyond this point was not an ordinary treatment process normally applied by miners in order to obtain the commercially marketable mineral product.

In the stipualted facts before us, there is no indication that the purchasers at the dredge either had a special use for the "crude" mineral or that they performed ordinary treatment processes to the minerals in order to make them ready for industrial use or consumption. The fact that during the trip from the barge to the shore installation the water content of the minerals was reduced is of no consequence, since it is not necessary that the sand and gravel dry out in order to make it marketable. In fact, too little moisture can be undesirable. What taxpayer did to the minerals after arrival at their shore installations cannot be considered an ordinary treatment process. Cf., Matagorda Shell Co., 29 T.C. 1060 (1958). The minerals were washed, crushed and sorted at the dredge. What taxpayer did at its shore installations was to stockpile the sand and gravel at its own docks and load the materials for delivery to its customers. In United States v. Utco Products, Inc., 257 F.2d 65, 68 (10th Cir. 1958), the court stated:

> * * * the phrase "ordinary treatment process," except where the statute otherwise provides, means a process of treating which separates the mineral from other minerals in which it is found or with which it is associated, or which effects a chemical or physical change in the mineral itself, such as crushing, separating, removing impurities, pulverizing, hardening and the like.

Stockpiling is not designed to effect a physical or chemical change in the sand and gravel. The physical separation was done at the dredge. Moreover, stockpiling here was not a requisite for making the mined minerals marketable. Cf., Lumaghi Coal Co. v. Helvering, 124 F.2d 645 (8th Cir. 1942). We have determined that taxpayer did not perform beyond the dredge any ordinary treatment processes. The fact that taxpayer had to transport its mineral product to shore to make it accessible to *some* of its customers is not determinative, since under the statute transportation is includible in mining only if the transportation was to a location where the mineral underwent ordinary treatment processes. Zonolite Co. v. United States, 211 F.2d 508 (7th Cir. 1954); Winnsboro Granite Corp., 32 T.C. 974 (1959), aff'd per curiam, 283 F.2d 307 (4th Cir. 1960).

We hold that taxpayer's depletion allowance with respect to its sales to customers on shore should be computed by using per ton prices at the dredge, since

for the year in issue (1955) taxpayer did not perform any ordinary treatment process beyond this point. Consequently, taxpayer is not entitled to recover and this portion of the petition is dismissed.