T.C. Memo. 1999-247


UNITED STATES TAX COURT


EXXON CORPORATION AND AFFILIATED COMPANIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 18618-89, 18432-90.          Filed July 28, 1999.


<u>Robert L. Moore II</u>, <u>Frederick H. Robinson</u>, <u>Lisa F. Opoku</u>,
and <u>Jordan L. Klingsberg</u>, for petitioners.

<u>Allan E. Lang</u>, <u>Christopher Fisher</u>, and <u>Todd Ludeke</u>, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  The issue for decision is the proper accrual,
under the all-events test of section 461, of approximately
$900 million in interest expense relating to increases in

petitioners' Federal income taxes for the years 1972 through 1978.[1]

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

FINDINGS OF FACT

During the years in issue, petitioners constituted an affiliated group of more than 175 U.S. and 500 foreign subsidiary corporations.  Petitioner Exxon Corp. was the common parent of the affiliated group.  Hereinafter, petitioners will be referred to simply as Exxon.

The businesses in which Exxon was engaged primarily involved exploration, production, transportation, and sale of crude oil and natural gas and manufacture of petroleum products. Additional businesses in which Exxon was engaged involved exploration and mining of coal and uranium, production of nuclear fuel, and businesses unrelated to the energy field such as manufacture and sale of office supply equipment.

Exxon constituted one of the largest groups of industrial corporations in the United States.

Exxon filed consolidated U.S. corporation income tax returns.  The preparation of Exxon's consolidated corporation

---

[1]    Other issues were tried and briefed separately and will be the subject of separate opinions.

income tax returns constituted a time-consuming and difficult undertaking for employees, accountants, and other tax professionals and staff hired by Exxon for that purpose.  The preparation of Exxon's consolidated corporation income tax returns was particularly difficult due to the large volume, size, and variety of the many businesses in which Exxon was engaged, the quantity of information required for the preparation of the tax returns relating to the businesses in which Exxon was engaged, and the significant complexity of U.S. and foreign tax laws to which Exxon's businesses were subject.

Exxon's consolidated corporation income tax returns that were filed with respondent consisted of documents several feet thick and thousands of pages.  During the year and during the months immediately after the end of the year up until the date on which each of Exxon's consolidated corporation income tax returns was filed, employees in Exxon's tax department gathered information from Exxon's numerous subsidiary and affiliated corporations located in the United States and throughout the world and prepared and assembled Exxon's consolidated corporation income tax returns.

In spite of extensive and good faith efforts by Exxon's employees to obtain all of the relevant information for preparation of Exxon's consolidated corporation income tax returns, by the time the income tax returns were due to be filed

with respondent (including extensions of time granted by respondent), much information and many documents necessary for Exxon to file with respondent complete and accurate income tax returns were not available to Exxon's income tax return preparers.

After filing the original consolidated corporation income tax returns with respondent, Exxon's employees responsible for the accuracy and filing of Exxon's income tax returns continued to gather information relating to Exxon's many businesses in the United States and throughout the world with respect to various income, expense, and credit items.

For each of the years 1972 through 1978, respondent's representatives audited Exxon's consolidated corporation income tax returns. During the audits, Exxon's and respondent's representatives maintained a relatively open and congenial relationship with each other. Respondent's audits commenced with a meeting between representatives of Exxon and respondent during which guidelines and ground rules for the conduct of the audits were discussed and agreed upon. Procedures were agreed upon for the exchange of information and for the handling of proposed adjustments.

During the audits, the general intent of Exxon's and of respondent's representatives was to resolve by agreement and without protest, appeal, or litigation as many adjustments as

possible. No agreement, however, was entered into or reached between Exxon's and respondent's representatives as to specifically when and how Exxon's representatives would communicate to respondent's representatives Exxon's agreement with and decision not to protest discrete audit adjustments.

During respondent's audits, respondent's representatives examined Exxon's books and records and, generally through information document requests (IDR's), requested information and documents from Exxon.

As adjustments were identified with regard to Exxon's Federal income tax liabilities, respondent's representatives would prepare and provide to Exxon's representatives written Notices of Proposed Adjustment (Forms 5701) describing the amounts and nature of the adjustments.

Also during the audits, Exxon's representatives would provide to respondent's representatives information regarding income, expense, and credit items that Exxon's representatives had identified as not being reflected accurately on Exxon's consolidated corporation income tax returns. Items so provided by Exxon's representatives to respondent's representatives are referred to by Exxon and herein as "volunteered" adjustments. Some of the volunteered adjustments represented adjustments in favor of Exxon and some in favor of respondent.

Upon receipt of information regarding volunteered adjustments, respondent's representatives would not automatically accept the proposed adjustments. Rather, respondent's representatives would review, analyze, and audit the information provided by Exxon's representatives and would make determinations after discussions and negotiations with Exxon's representatives as to the appropriate adjustments, if any, and respondent's representatives would propose the adjustments so determined in Forms 5701 that were given to Exxon's representatives.[2]

--------

[2]    IDR No. 85 (Trial Exhibit 137), bears upon the so-called volunteered adjustments for the years 1974, 1975, and 1976. It establishes: (1) Respondent's representatives' awareness of and expectation that volunteered adjustments would be received from Exxon; and (2) respondent's and Exxon's representatives' understanding that respondent's representatives would not automatically accept the information with regard to volunteered adjustments provided by Exxon's representatives but rather would review and audit the information. Set forth below is language from IDR No. 85 describing the information requested of Exxon by respondent's representatives:

IDR No. 85, Description of Documents Requested

(1) After a return is filed, taxpayers frequently discover errors in the return that was filed which include the following:

(a) Deductions claimed which are not deductible
(b) Deductions not claimed which are deductible
(c) Income reported which is not taxable
(d) Income not reported which is taxable
(e) Credits not claimed which should be on the return
(f) Credits claimed which are not proper

(2) Please submit a list of any such items which have been discovered subsequent to the filing of the returns for 1974, 1975, and 1976.

(3) Please submit a detailed explanation of the items under (2) so this agent can determine if the items should be corrected by including them in the RAR as an adjustment.

There were located on the original and copy of the Forms 5701 that respondent's representatives provided to Exxon's representatives a set of boxes, and Exxon's representatives were requested to check one of the boxes to indicate whether they agreed, agreed in part, or disagreed with the proposed adjustments and to return to respondent's representatives the copies of the Form 5701. Exxon's representatives, however, following a policy decision that had been made, did not indicate in the boxes or otherwise on the Forms 5701 whether or not Exxon agreed, agreed in part, or disagreed with respondent's proposed adjustments.

Over the years, Exxon's representatives used different methods to communicate in writing to respondent's representatives Exxon's agreement to specific adjustments. As indicated, the Forms 5701 were not used by Exxon's representatives to communicate to respondent's representatives Exxon's agreement to specific adjustments. Exxon's representatives did communicate in writing to respondent's representatives Exxon's agreement to certain adjustments that respondent had raised for the years in issue by entering into written Form 870 agreements (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) and Form 870-AD agreements (Offer to Waive Restrictions on Assessment and Collection of Tax Deficiency and to Accept Overassessment) and by making

concessions or signing written stipulations of settlement that were filed with this Court during pendency of these cases. Occasionally, Exxon's representatives indicated agreement to proposed audit adjustments in their written responses to IDR's.

For each year, more than 250 audit adjustments to Exxon's consolidated corporation income tax returns were identified and proposed by respondent's representatives.

During respondent's audits of Exxon's consolidated corporation income tax returns for 1972 through 1978, there were what Exxon refers to as four major agreed adjustments that were identified and raised by respondent's representatives and that, by the end of each audit, were agreed to by Exxon's and respondent's representatives and that increased Exxon's U.S. source income for each year (the four major agreed adjustments). However, in their petitions to this Court with regard to income tax deficiencies that respondent determined against Exxon for 1979 through 1982, Exxon did object to and did challenge the correctness of the four major agreed adjustments.

The four major agreed adjustments represent approximately 85 percent of the total adjustments that, by the end of respondent's audits of Exxon for 1972 through 1978, were agreed to by Exxon's and respondent's representatives and that were not further protested or litigated by Exxon (the agreed adjustments).

The agreed adjustments do not include significant other adjustments that were raised by respondent on audit and that were protested by Exxon or that were raised by Exxon in claims for refund and that are still pending in litigation.

A brief description of each of the four major agreed adjustments is set forth below.

G&G Costs

The first of the four major agreed adjustments relates to costs of geological and geophysical (G&G) activity and the deductibility of such costs as current business expenses or the nondeductibility thereof as capital expenditures. G&G activity involves work of geologists and geophysicists in obtaining and analyzing geographical seismic data for purposes of identifying energy-related natural resources.

Generally, at the time Exxon's consolidated corporation income tax returns were filed, information was not yet available to Exxon's geologists and geophysicists (and therefore it was not available to those individuals preparing and filing Exxon's income tax returns) as to whether particular G&G costs incurred in a year resulted in the discovery of commercially exploitable energy resources. However, on Exxon's consolidated corporation income tax returns as originally filed for each year, all of Exxon's G&G costs that were incurred in a year were treated by

Exxon's income tax return preparers as not resulting in the discovery of commercially exploitable energy resources and therefore as currently deductible business expenses.

During the audits for the years in issue, Exxon's and respondent's representatives generally agreed as to the applicable law relating to the treatment of G&G costs. They generally understood that to the extent they could agree that information provided during the audits to respondent's representatives established which particular G&G activity led to the discovery of commercially exploitable energy resources, the related G&G costs would be disallowed as current expenses and would be treated as nondeductible capital expenditures.

Upon receipt during the audits from Exxon's representatives of information regarding particular G&G activity that had occurred in a year, respondent's representatives would review and analyze the information, discuss the information with Exxon's representatives, make inquiries with regard thereto, and negotiate with Exxon's representatives over whether such information established that particular G&G activity had or had not led to the discovery of commercially exploitable energy resources and whether the related costs should be treated as ordinary expenses or as capital expenditures.

The following schedule for 1972 through 1978 reflects the amount of claimed G&G costs that, on audit by respondent, were

disallowed and that Exxon's representatives agreed constituted
nondeductible capital expenditures because they led to
commercially exploitable energy resources that produced income
for Exxon over the course of a number of years:

| Year | Capitalized G&G Costs |
|------|----------------------|
| 1972 | $ 2,029,833 |
| 1973 | 4,114,117 |
| 1974 | 9,289,354 |
| 1975 | 8,701,886 |
| 1976 | 9,359,770 |
| 1977 | 16,631,441 |
| 1978 | 21,757,729 |

Proratables Adjustment

The second of the four major agreed adjustments (referred to
by the parties as the "proratables adjustment") was made only for
1972 through 1976 and involves the characterization or allocation
of certain of Exxon's administrative expenses between U.S. and
foreign sources.  Allocations of Exxon's expenses to foreign
sources decreased Exxon's foreign source income and reduced
foreign tax credits that Exxon could claim against its U.S. tax
liabilities.

Similar to G&G activity, Exxon's and respondent's
representatives generally agreed as to the applicable law
relating to the allocation of administrative expenses between
U.S. and foreign sources.  Upon receipt during the audits from
Exxon's representatives of information relating to Exxon's

administrative expenses, respondent's representatives would review and analyze the information.

After discussions and negotiations with regard to the information, Exxon's and respondent's representatives reached agreement as to allocation of Exxon's administrative expenses between U.S. and foreign sources. Pursuant thereto, Exxon's proratable expenses were reallocated to Exxon's foreign source income in the following amounts:

| Year | Administrative Expenses Reallocated To Foreign Source Income |
|------|-------------------------------------------------------------|
| 1972 | $38,375,438 |
| 1973 | 46,152,229 |
| 1974 | 53,111,300 |
| 1975 | 40,790,620 |
| 1976 | 45,235,003 |

Other Sourcing Adjustments

The third major agreed adjustment (the so-called "other sourcing adjustments") involves for 1972 through 1977 the characterization or allocation of certain expenses of Exxon's affiliated companies as between U.S. and foreign sources. Similar to the G&G and proratables adjustments, Exxon's and respondent's representatives generally agreed as to the applicable law relating to the other sourcing adjustments. Upon receipt during the audits from Exxon's representatives of information relating to expenses of Exxon's affiliated companies,

respondent's representatives would review and analyze the information.

After discussions and negotiations with regard to the information, Exxon's and respondent's representatives agreed that expenses of Exxon's affiliated companies should be reallocated from U.S. sources to foreign sources as follows:

| Year | Expenses Relating To Exxon's Affiliates Reallocated To Foreign Source Income |
|------|------------------------------------------------------------------------------|
| 1972 | $21,911,570 |
| 1973 | 18,948,396 |
| 1974 | 12,418,119 |
| 1975 | 10,923,260 |
| 1976 | 3,381,041 |
| 1977 | 13,935,690 |

Oil Refinery Repair Costs

The fourth major agreed adjustment relates to the treatment for 1972 through 1976 of costs of repairing Exxon's oil refineries as current expenses or as capital expenditures.

Similar to the G&G costs, proratables, and other sourcing adjustments, Exxon's and respondent's representatives generally agreed on the applicable law relating to the oil refinery repair costs adjustment. Upon receipt during the audits from Exxon's representatives of information relating to the repair of Exxon's oil refineries, respondent's representatives would review and analyze the information.

After discussions and negotiations with regard to the information, Exxon's and respondent's representatives agreed that costs relating to repair of Exxon's oil refineries that on Exxon's consolidated corporation income tax returns had been expensed were to be capitalized as follows:

| Year | Capitalized Refinery Repair Costs |
|------|-----------------------------------|
| 1972 | $ 9,807,560 |
| 1973 | 8,084,376 |
| 1974 | 11,963,680 |
| 1975 | 4,515,610 |
| 1976 | 2,504,448 |

In general, adjustments made by respondent that Exxon formally protested beyond the audit level to respondent's Appellate Division and/or in litigation represented issues of importance to Exxon and to the oil and gas industry. Examples of such protested adjustments are the treatment of construction costs of offshore drilling platforms as intangible drilling and development costs and the eligibility of pipeline right-of-way costs for depreciation and investment tax credits.

For 1972 through 1978, respondent's audits concluded with issuance to Exxon of Revenue Agent's Reports (RAR's). Each RAR summarized respondent's proposed adjustments and set forth proposed income tax deficiencies for each year.

By the end of respondent's audits of Exxon for 1972 through 1978, respondent had made hundreds of adjustments to Exxon's

consolidated corporation income tax returns, and Exxon's and respondent's representatives had reached agreement on 78 percent of the total number of adjustments, of which, as indicated, the four major agreed adjustments represented approximately 85 percent of the net agreed adjustments. Respondent's audit of Exxon for 1972 and 1973 ended in 1981. Respondent's audit of Exxon for 1974, 1975, and 1976 ended in 1985. Respondent's audit of Exxon for 1977 and 1978 ended in 1989.

After or simultaneously with receiving respondent's RAR's relating to the years 1972 through 1977, Exxon's representatives signed Forms 870 with respect to the agreed adjustments and to the portions of the proposed tax deficiencies that were agreed. Respondent then assessed the taxes agreed to and statutory interest due thereon, and Exxon soon thereafter paid the amount of the assessed tax deficiencies and interest (the amount of the interest accrued from the due date of Exxon's consolidated corporation income tax returns to the date of payment). Also for 1972 through 1977, with regard to certain unagreed issues and tax deficiencies determined by respondent relating thereto, respondent issued to Exxon notices of deficiency.

For 1978, at the conclusion of respondent's audit, Exxon did not enter into a Form 870 agreement. For 1978, respondent issued a notice of deficiency and assessed the tax deficiency and statutory interest that Exxon paid.

For 1972 through 1978, after paying the agreed tax deficiencies determined by respondent on audit and the interest due thereon, Exxon filed with respondent a number of claims for refund relating to unrelated items of income, expense, and credit, which claims for refund for a number of the years exceed the amounts paid by Exxon as tax deficiencies relating to the agreed adjustments for each year.

As indicated, however, petitioners did not contest, through protests or refund claims, the adjustments relating to the four major agreed adjustments or the adjustments relating to the other agreed adjustments.

For financial accounting purposes, Exxon accrued ratably for each year interest on estimated net tax deficiencies.

Accrual of Deficiency Interest on
Exxon's Income Tax Returns

Exxon's consolidated corporation income tax returns for 1972 through 1978 were prepared on the accrual method of accounting, and Exxon used the accrual method of accounting to accrue interest expense.

On its consolidated corporation income tax returns as filed for 1972 through 1978, Exxon did not accrue ratably interest on the income tax deficiencies that respondent determined for each year until the underlying and related tax deficiencies were set forth in agreed Forms 870, in closing agreements, or until the

tax deficiencies were assessed by respondent (namely, in 1981, for the interest relating to the 1972 and 1973 tax deficiencies; in 1985, for the interest relating to the 1974, 1975, and 1976 tax deficiencies; and in 1989, for the interest relating to the 1977 and 1978 tax deficiencies).

In 1989 and 1990 in the petitions filed in these cases, petitioners made the claim that the total statutory interest that related to Exxon's agreed income tax deficiencies for 1972 through 1978 should be accrued not in and for the year the audits for those years were concluded and in which the Form 870 agreements were entered into or the year in which the assessments occurred (namely, 1981, 1985, and 1989), but that the interest should relate back to the years 1973 through 1989 and should accrue ratably in each year to which the interest relates.

OPINION

Under section 461(a), a deduction is to be allowed in the proper taxable year under the method of accounting used in computing a taxpayer's income.

Under the all-events test of the accrual method of accounting, a liability expense accrues in the year in which all the events have occurred which establish the fact of liability for the expense and in which the amount of the liability can be determined with reasonable accuracy.  See United States v.

Anderson, 269 U.S. 422, 441 (1926); sec. 1.461-1(a)(2)(i), Income Tax Regs.

As the Supreme Court has explained:

It is fundamental to the "all events" test that, although expenses may be deductible before they have become due and payable, liability must first be firmly established.  This is consistent with our prior holdings that a taxpayer may not deduct a liability that is contingent * * * [United States v. General Dynamics Corp., 481 U.S. 239, 243 (1987).]

As we have further explained:

The all-events test is based on the existence or nonexistence of legal rights or obligations at the close of a particular accounting period, not on the probability--or even absolute certainty--that such right or obligation will arise at some point in the future. * * * [Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 34 (1988).]

If, at the end of a year, a taxpayer's liability for an expense remains contested and contingent, the expense will not be treated as being established under the all-events test of section 461.  See Security Flour Mills Co. v. Commissioner, 321 U.S. 281, 284 (1944); Dixie Pine Prods. Co. v. Commissioner, 320 U.S. 516, 519 (1944).  A contested liability will not be regarded as sufficiently established until resolution of the contest.  See Dixie Pine Prods. Co. v. Commissioner, supra; Dravo Corp. v. United States, 172 Ct. Cl. 200, 348 F.2d 542, 545 (1965).

As stated by the Supreme Court in <u>Dixie Pine Prods. Co. v.</u>
<u>Commissioner</u>, <u>supra</u> at 519:

> in order truly to reflect the income of a given year,
> all the events must occur in that year which fix the
> amount and the fact of the taxpayer's liability for
> items of indebtedness deducted though not paid; and
> this cannot be the case where the liability is
> contingent and is contested by the taxpayer. * * *
> [Fn. refs. omitted.]

In section 1.461-2(b)(2), Income Tax Regs., definition of a
"contested liability" is provided, as follows:

> Any contest which would prevent accrual of a liability
> under section 461(a) shall be considered to be a
> contest in determining whether the taxpayer satisfies
> paragraph (a)(1)(i) of this section.  A contest arises
> when there is a bona fide dispute as to the proper
> evaluation of the law or the facts necessary to
> determine the existence or correctness of the amount of
> an asserted liability. * * *

Generally, whether a bona fide dispute exists as to the
proper law and facts, whether a liability is contested, and when
a contested liability is resolved involve questions of fact to be
answered on the basis of the facts and circumstances of each
particular situation.  See <u>Phillips Petroleum Co. & Affiliated</u>
<u>Subs. v. Commissioner</u>, T.C. Memo. 1991-257.

In <u>General Communication Co. v. Commissioner</u>, 33 T.C. 640,
654 (1960), we stated as follows:

> The presence of an admission, express or implied,
> serves as direct proof that the taxpayer was not
> contesting liability.  But absence of an admission,
> while not conclusive proof of a contest, certainly
> leaves a gap in petitioner's proof * * * [Id. at 654.]

There are a number of court opinions involving a variety of factual situations and the question of whether accrual basis taxpayers' liabilities with regard to tax adjustments and the related statutory interest should be regarded as sufficiently settled, as fixed and definite, and whether the amounts thereof were determinable with reasonable accuracy, or whether the taxpayers' liabilities therefor should be regarded as contingent and contested.

A number of courts have defined a contest narrowly and have suggested that affirmative acts by taxpayers which establish clearly the existence of the contest should be present in order for the asserted tax liabilities to be regarded as contested.  In Hollingsworth v. United States, 215 Ct. Cl. 328, 568 F.2d 192, 202-203 (1977), a dispute with a State agency, not with respondent, over a change in method of accounting and what was regarded merely as a "naked suggestion" (not as an objection) by the taxpayer to respondent that a proposed adjustment not be made until a following year were treated as not rising to the level of a contest with respondent over the related income tax deficiency and interest.

In <u>Dravo Corp. v. United States</u>, 348 F.2d at 544-546, a taxpayer's liability for additional State taxes was asserted during an audit occurring in a later year. The taxpayer paid the additional State taxes without protest or appeal. The Court of Claims rejected the argument that the mere filing of a tax return acknowledging a liability in a stated amount automatically should be regarded as giving rise to a contest with regard to additional amounts asserted on audit by a taxing authority. The Court of Claims stated that a contest "should be evidenced by * * * objective acts; i.e., lodging a formal protest with the tax authorities or instituting a suit in a court of law". <u>Id.</u> at 546.

In <u>Lutz v. Commissioner</u>, 396 F.2d 412, 414 (9th Cir. 1968), revg. 45 T.C. 615 (1966), the taxpayer accrued State sales tax on its Federal income tax returns even though other taxpayers were contesting their liability therefor. The Court of Appeals for the Ninth Circuit allowed the accrual, explaining that a third party's contest of a liability does not necessarily make the liability of a similarly situated taxpayer (who did not contest the liability) contingent.

In <u>Woodmont Terrace, Inc. v. United States</u>, 261 F. Supp. 789, 792-793 (M.D. Tenn. 1966), questions raised with a State official within a few months after the end of a liquidating corporation's last taxable year over a State franchise tax audit

adjustment were not treated as making the tax adjustment contested and nonaccruable.

H.E. Fletcher Co. v. Commissioner, a Memorandum Opinion of this Court dated Oct. 26, 1951, involved a taxpayer's attempt to accrue interest relating to tax adjustments in the year in which the interest was paid, not for years to which the interest related. The case involved no evidence that the tax adjustments were contested or other than fixed and definite. The Court did not allow the accrual basis taxpayer to accrue the interest in the later year in which the interest was paid.

As we understand the above authorities, situations which would allow the accrual of interest relating to tax audit adjustments for the years to which the interest relates generally are distinguishable from situations such as those involved herein (namely, situations where facts relating to the tax audit adjustments and the amounts thereof are, for a number of years, indefinite, where the adjustments are eventually developed based largely on information available to both taxpayers' and respondent's representatives only over the course of years after the filing of the tax returns, where negotiations occur with regard to the nature and character of the underlying transactions giving rise to the tax adjustments, and where agreements with regard to the tax adjustments are reached through such negotiations years after the filing of the tax returns to which

the tax adjustments relate).  In the latter situations, because of the uncertainties relating to the appropriate adjustments to be made, the taxpayers' liability therefor is to be regarded as not sufficiently fixed and definite until the agreements relating to the tax adjustments are entered into in a clear and formal manner.  In such situations, for Federal income tax purposes, the statutory interest relating to the eventually agreed-upon tax adjustments is not accruable until the agreements are entered into and are clearly established.

Exxon relies on language in section 1.461-2(b)(2), Income Tax Regs., that describes certain "affirmative" acts that are to be treated as commencing a protest of an asserted liability. That language provides as follows:

> An affirmative act denying the validity or accuracy, or both, of an asserted liability to the person who is asserting such liability, such as including a written protest with payment of the asserted liability, is sufficient to commence a contest.  Thus, lodging a protest in accordance with local law is sufficient to contest an asserted liability for taxes.  It is not necessary that the affirmative act denying the validity or accuracy, or both, of an asserted liability be in writing if, upon examination of all the facts and circumstances, it can be established to the satisfaction of the Commissioner that a liability has been asserted and contested.

We do not construe the above language as necessarily requiring a particular affirmative act of protest or litigation to a proposed tax adjustment in order for the adjustment to be

regarded as unsettled and contested. The language of the regulation indicates only what is "sufficient" to commence a contest and does not purport to be exhaustive. See Consolidated Indus., Inc. v. Commissioner, 82 T.C. 477, 483 (1984), affd. per curiam 767 F.2d 41 (2d Cir. 1985). In our opinion, the key portion of the above regulatory language is that found in the last sentence, namely, what do the "facts and circumstances" of each situation establish? As stated in Phillips Petroleum Co. & Affiliated Subs. v. Commissioner, T.C. Memo. 1991-257:

> Ultimately, a determination must be made, based upon a consideration of all the facts and circumstances.

Exxon alleges that the adjustments in question (and therefore the statutory interest) should be treated as automatic and uncontested, that the existence and amount of the adjustments should be regarded as simply a matter of gathering information from Exxon's worldwide operations, and that when the figures were finalized with regard to the tax adjustments, the adjustments should be regarded as relating back and as having been fixed, definite, and uncontested from the end of the tax years to which they relate. Accordingly, Exxon argues, the related statutory interest should relate back and should be accruable ratably for each year from the due dates of the tax returns to which the tax adjustments relate. We do not agree.

With regard particularly to the four major agreed adjustments, we note the series of post-tax-return events that had to occur in order to establish Exxon's liability with regard thereto. Additional information had to be gathered from Exxon's many units and affiliated companies. That information had to be organized and analyzed by Exxon's representatives and submitted to and audited by respondent's representatives. Discussions and negotiations with regard to the information had to occur. Disagreements with regard to characterization questions had to be resolved. Any disagreements had to be negotiated, and agreements reached or not reached. All of these activities or events occurred during the audits, years after the consolidated corporation income tax returns were filed.

Exxon argues that for each year 1972 through 1978, of necessity and in spite of good faith and reasonable efforts to file more complete and accurate income tax returns by the due dates thereof, Exxon's representatives who were in charge of preparing and filing Exxon's income tax returns knew and understood that adjustments to the income tax returns would be necessary and that appropriate and agreed adjustments to the tax returns were to be communicated and volunteered to respondent's representatives by Exxon's representatives either formally via amended returns or informally during the audits of Exxon's tax returns. This may be true for certain adjustments. The

evidence, however, does not indicate that the four major agreed adjustments constituted volunteered adjustments.

Further, even with regard to the so-called volunteered adjustments, respondent's representatives did not automatically agree to the adjustments suggested by Exxon's representatives. Rather, as we have found, information with regard thereto was reviewed and audited by respondent's representatives, and the amounts of the adjustments determined by respondent's representatives were set forth in the Forms 5701 that were provided to Exxon.

Because the four major agreed adjustments represent approximately 85 percent of the total of the agreed tax deficiencies and because the balance of the agreed tax adjustments were "similarly compromised", Exxon argues that all of the agreed adjustments should be treated as uncontested adjustments. We disagree.

Not until the end of the audits are the adjustments in question in these cases to be treated as agreed. That is when the Forms 870 were entered into and/or the assessments were made. By then, the adjustments were agreed to, and respondent acknowledges that the all-events test was satisfied. Prior thereto, the adjustments in question had been discussed, proposed, negotiated, and subject to agreement and compromise on factual issues such as the characterization of the costs. These

circumstances do not reflect the stuff of "fixed and definite" liabilities.

Exxon emphasizes that, in spite of Exxon's failure to indicate on the Forms 5701 its agreement or disagreement to the adjustments, respondent's representatives generally throughout the audits had a "feeling" as to whether proposed adjustments reflected in the Forms 5701 were agreed to or were contested by Exxon's representatives.  Exxon argues that once its representatives informally and orally communicated to respondent's representatives its intent not to protest an adjustment, Exxon regarded itself, and Exxon should be treated, as having made a commitment not to do so.

Further, because of its general policy objective and intent to seek agreement on as many proposed adjustments as possible, Exxon argues that, by default, all adjustments made by respondent that were not specifically protested and not expressly contested should be regarded, throughout the audits, as "agreed" and "uncontested" adjustments that relate back to the due dates of the tax returns.  We disagree.

The bottom line is that prior to the end of the audits and prior to the time the Form 870 agreements were entered into or assessments were made, insufficient specific communications were provided to respondent's representatives reflecting Exxon's agreement to the agreed adjustments.

The trial evidence establishes that the four major agreed adjustments were resolved in the course of the audits. But the trial evidence does not establish when, during the course of the audits, the four major agreed adjustments were resolved, short of the end of the audits. The mere fact that respondent's representatives may, during the course of the audits, have had a "feeling" for where Exxon's representatives stood on the major agreed issues does not rise to the level of an agreement.

In our opinion, the adjustments in question and the related statutory interest are to be treated as not fully settled, as not sufficiently fixed and definite, as contested, and as not resolved until the end of respondent's audits, when assessments of the tax deficiencies relating thereto were agreed to or when the assessments occurred, at which point in time deficiency interest relating to the adjustments is accruable.

We note the following points that, taken together, we regard as objective evidence that Exxon's liability for the agreed adjustments was not fixed and definite until the end of the audits when the Form 870 agreements were entered into without further protest or litigation by Exxon or when the assessments occurred:

> (1) Exxon's consolidated corporation income tax returns reflected amounts different from those reflected in the agreed adjustments;

(2) The adjustments were raised by respondent in written format in Forms 5701;

(3) Exxon did not indicate on the Forms 5701 agreement to the adjustments;

(4) With few exceptions, Exxon did not provide any other written statements to respondent of agreement to the adjustments until the Form 870 agreements were entered into; and

(5) In petitions filed in this Court for 1979 through 1982, Exxon did challenge a number of the so-called agreed adjustments, contrary to Exxon's claim that these adjustments were routinely agreed to for each year.

Based on the evidence before us, we conclude that the statutory interest in question, relating to the agreed adjustments and agreed tax deficiencies assessed by respondent against Exxon at the conclusion of the audits for the years 1972 through 1978, does not satisfy the all-events test of section 461 and is not accruable until the end of the audits when Exxon, for the years 1972 through 1977, reflected its agreement thereto in the Form 870 agreements or, for 1978, when the assessment occurred.

In light of our findings and conclusion set forth above, it is not necessary to address other arguments made by respondent as to the proper accrual of the interest in question.

Our holding in this opinion will be incorporated into the decisions to be entered in these cases when all other issues are resolved.